**FOR PUBLICATION**

DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN
APPELLATE DIVISION

CARL SIMON,                          )
                                     )
    *Appellant,*                    )
                                     )     D. C. Civ. App. No. 2003/024
             v.            )
                                     )
                                     )     Super. Ct. Misc. No. F28/2000
GOVERNMENT OF THE VIRGIN             )
ISLANDS,                             )
                                     )
    *Appellee.*                     )
—————————————————————————— )

On Appeal from the Superior Court of the Virgin Islands,
the Honorable Rhys S. Hodge presiding.

**Considered: April 22, 2014**
**Filed: July 29, 2015**

**BEFORE: WILMA A. LEWIS**, Chief Judge of the District Court of the Virgin Islands;
**CURTIS V. GÓMEZ**, Judge of the District Court of the Virgin Islands; and **DOUGLAS A.
BRADY**, Judge of the Superior Court of the Virgin Islands, sitting by designation.

**ATTORNEYS:**

**Joseph A. DiRuzzo, III, Esq.**
Miami, FL
    *For the Appellant, Carl Simon*

**Bernard M. VanSluytman, Esq.**
St. Thomas, VI
    *For the Appellee, Government of the Virgin Islands*

| MEMORANDUM OPINION |
| :---: |

**PER CURIAM**

In this appeal, Carl Simon ("Simon") challenges on numerous grounds the July 18, 2002 Order of the Superior Court of the Virgin Islands dismissing his February 2000 amended petition for a writ of habeas corpus filed pursuant to 5 V.I.C. § 1314. Joint Appendix ("JA") 4. For the reasons that follow, Simon's appeal will be dismissed in part and remanded in part. It will be remanded to the Superior Court for a development of the factual record underlying Simon's claim that Michael Joseph, Esq. rendered ineffective assistance of counsel in failing to appeal this Court's August 20, 1997 Opinion affirming Simon's conviction to the United States Court of Appeals for the Third Circuit. Simon's appeal of his habeas petition will be dismissed in all other respects.

## I.    BACKGROUND AND PROCEDURAL HISTORY

In September 1993, Simon, James Roach ("Roach"), and another individual burglarized a house on St. John, U.S. Virgin Islands. Elroy Connor ("Connor"), who lived in the house, and his friend Daniel Ezekiel ("Ezekiel"), arrived during the burglary. An altercation ensued and Ezekiel was shot dead. Simon, Roach, and the third person fled the scene with money and other valuables. Simon and Roach were later separately apprehended.

Roach was charged with first-degree murder, a local charge, and unlawful flight to avoid prosecution, a federal charge. On May 5, 1994, after a two-day trial, he was convicted of both charges in the District Court of the Virgin Islands and was sentenced to life imprisonment on the

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 3

murder charge. JA 7. Roach filed a Notice of Appeal to the Third Circuit on May 11, 1994.[1] He

moved to dismiss his appeal on March 20, 1995.

Shortly after Simon's arrest in May 1994, the Government of the Virgin Islands (the

"Government") filed an Information in the Superior Court of the Virgin Islands[2] charging him

with two local charges: premeditated murder, in violation of 14 V.I.C. §§ 921 and 922(a)(1)

(Count I), and third-degree burglary, in violation of 14 V.I.C. § 444(1) (Count II).  JA 67. The

Virgin Islands Public Defender's Office was appointed to represent Simon. JA 38. During a

January 10, 1995 pretrial conference, the Government stated that it intended to amend the

Information to add a count of robbery. JA 87. The judge directed the Government to file a

written motion and to give Simon, represented by his trial counsel, Augustin Ayala, Esq.

("Ayala"), an opportunity to respond. *Id.*[3]

On January 13, 1995, the Government provided Simon with a copy of an Amended

Information containing four counts. JA 96. Count I charged felony murder, based on the

predicate felony of robbery, in violation of 14 V.I.C. §§ 11(a), 921, and 922(a)(1); Count II

charged robbery, in violation of 14 V.I.C. §§ 11(a) and 1862(2); Count III charged conspiracy to

commit robbery, in violation of 14 V.I.C. § 551(1); and Count IV charged burglary, in violation

of 14 V.I.C. § 444(1). *Id.* At the January 13, 1995 hearing, Simon opposed the proposed

amendment because it added new counts. JA 121.

---

[1] The appeal was docketed at USCA Appeal No. 94-7284.

[2] At the time of the proceedings, the Superior Court was known as the Territorial Court. The Virgin Islands Legislature renamed the court in 2004, substituting "Superior" in place of "Territorial." *See* 2004 V.I. Sess. Laws 179 (Act No. 6687, § 1(b) (amending 4 V.I.C. § 2). In light of this change, we will refer to the trial court as the Superior Court.

[3] Ayala was an Assistant Territorial Public Defender.

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 4

The Government filed its motion to amend the Information on January 18, 1995 ("First

Amended Information"). JA 130. At a pretrial conference prior to jury selection on January 23rd,

the Government responded to the Court's observation that the First Amended Information was

defective by stating that it would not present the conspiracy count. JA 141-42. Simon again

opposed the "last minute" amendment. JA 144. After a colloquy, the trial judge granted the

Government's motion to amend the proposed First Amended Information—to remove the

conspiracy count; change the language in the murder count to reflect the elements of felony

murder; and delete some text from the burglary count. JA 144-52, 158. The judge further stated

that the robbery charge was unobjectionable because the amended Count I provided that the

killing was allegedly perpetrated during the robbery, and that while the revised Information

added a new count of robbery, he did not view it as prejudicing the Defendant. JA 148. On

January 25, 1995, the Government filed the Second Amended Information that reflected the

changes resulting from the January 23rd pretrial colloquy. JA 750-52.

Simon's trial was held on January 24-25, 1995. During the trial, Roach appeared on

behalf of the Government, and testified that Simon shot Ezekiel. JA 318-20.

Ayala vigorously cross-examined Roach. He elicited testimony that Roach was angry "in

a way" that, although subpoenaed, Simon had not testified on Roach's behalf during Roach's

trial. Ayala argued that, as a result, Roach had a motive to testify against Simon at Simon's trial.

JA 337-38. Roach also expressed anger at Simon because Simon was the person who "shot the

man, and here I am, in trial, for something I didn't do. Carl Simon is who shot the man." *Id.* at

338. Further, Ayala caused Roach to admit that certain statements Roach made at his trial—*i.e.*,

that he did not know Simon, JA 341-44, and that he went by his girlfriend's house on the night of

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 5

the crime and thus was not at the scene of the crime, JA 365-69, 373, *see also* JA 297—were

lies. Roach also admitted that he lied to the judge and jury in his case, JA 373, as well as to a

police detective who took a statement from him after the crime, JA 381-82, 399, and a Deputy

Marshal investigating the crime when he stated that he did not know Simon. JA 344.

Roach further testified that he received "protection" from the Government.[4] When asked

by Ayala, "[d]o you know which Government gave the protection? Was it the Federal

Government or the Local Government?" Roach's response was, "I can't – the Local." JA 374-75.

During redirect examination, the Government attorney asked Roach to explain what he

received from the Government in exchange for testifying at Simon's trial:

> Q:     Mr. Roach, will you state to the Court and the Ladies and Gentlemen of the Jury,
>
> whether or not the Government has made any promises to you for your testifying
>
> here today, in terms of reducing or having to do anything with your case?
>
> A:     I ask for protection.
>
> Q:     And?
>
> A:     So that Carl Simon and he [sic] brother and they couldn't get to me.
>
> The Court: Are there any other promises that were made to you by the Government?
>
> A:     No, Sir.

JA 390.

Another eyewitness, Elroy Connor, whose house had been broken into, identified Roach

as one of the perpetrators. He testified that Roach was accompanied by a shorter man who wore a

---

[4] Roach explained that he had lied at his trial about what had transpired during the crime because "I was scared. I was scared for my life. That's why I didn't tell the truth then, cause Carl Simon say he going to kill me. But, I ask for protection, and I get it, so I willing to tell the truth now." JA 336-37.

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 6

stocking that covered his face, and that he struggled with Roach. JA 468, 470-71, 473-74. The

record reflected that Simon was shorter than Roach. JA 673. Another witness testified that he

saw Roach and Simon together around 10:45 p.m. on the night of the crime, JA 551-52, and

observed that Simon was acting nervous that evening. JA 556-60.

Simon called no witnesses. In his closing argument, Ayala pointed out that no one, and

no physical evidence, corroborated Roach's testimony implicating Simon. JA 655. He stressed

that Roach was a liar, JA 647-53, 658-59, and that Roach had "every reason to come here and

tell you that Mr. Simon was involved." JA 657.

The jury found Simon guilty of felony murder, first-degree robbery, and third-degree

burglary. JA 753-54. The trial judge sentenced Simon to life in prison without the possibility of

parole. *Id.*

Ayala and Simon filed separate Notices of Appeal to this Court (the Appellate Division

of the District Court) in February 1995. JA 755, 757. The then Territorial Chief Public Defender

Harold Willocks, Esq. ("Willocks") was substituted for Ayala on direct appeal. In August 1995,

Willocks filed a Motion to be Relieved as Counsel, asserting that Simon was dissatisfied with

Ayala's representation, which "has risen to the level of innuendos and accusations of ineffective

counsel," and that there may be a conflict if the Territorial Public Defender's Office continued to

represent Simon. JA 758-59. Subsequently, in February 1996, Willocks filed an Affirmation in

which he stated that his office could find no basis for an appeal of Simon's conviction. JA 762-

63. He also stated that Simon had communicated that he believed he had received "inadequate

assistance" of trial counsel; that Willocks and a former law professor had reviewed the trial

transcript and could find no indication of ineffective assistance; and that Willocks had written

Simon asking what Simon viewed as reversible error but had received no response. *Id.*

Willocks and Michael Joseph, Esq. ("Joseph") signed a Stipulation that was approved by

this Court on August 8, 1996 that substituted Joseph as counsel on Simon's direct appeal. JA

813-14. Joseph filed a brief arguing that the Superior Court erred in allowing the Government to

amend the Information. JA 815-18. Finding no prejudice to Simon from the amendment, this

Court affirmed his conviction on August 20, 1997. JA 819-27.

In response to a telephone message from Simon on September 9, 1997, Joseph wrote

Simon a letter dated September 10, 1997 stating, *inter alia,* that he would not file an appeal to

the Third Circuit in Simon's case because such an appeal would be "frivolous and without

merit." JA 828.[5] Simon drafted a notice of appeal the next day. JA 829. The appeal was

dismissed on December 17, 1997 by the Third Circuit as untimely. JA 831.

Meanwhile, on September 1, 1995, seven months after testifying for the Government at

Simon's trial, an Assistant United States Attorney ("AUSA") and Roach's counsel signed a

"Stipulation to Vacate [Roach's] Conviction of First Degree Murder to Second Degree Murder"

("Stipulation"). JA 760-61. The Stipulation memorialized the fact that Roach had withdrawn his

direct appeal to the Third Circuit on March 20, 1995 "under the condition that the United States

Attorney would stipulate to vacate his conviction of murder first degree and agree to charge

murder second degree as a reduced charge." JA 760. The Stipulation also provided that Roach

---

[5] Prior to the enactment of Pub. L. 112-226, H.R. 6116, §1-2, 112th Cong. (2012), An Act to
Amend the Revised Organic Act of the Virgin Islands, signed by the President on December 28,
2012, decisions from the District Court Appellate Division were reviewed by the Third Circuit.
*See Gov't of the V.I. v. Davis*, 561 F.3d 159, 160 n.2 (3d Cir. 2009) ("[P]ending decisions of the
Appellate Division may be reviewed by [the Third Circuit].").

had "rendered substantial assistance in the conviction of his accomplice, Carl Simon, which the

Department of Justice acknowledged by the attached letter dated August 1, 1995." *Id.* The

Stipulation further provided that, with regard to the outstanding and unsentenced federal charge

against Roach (unlawful flight), the U.S. Attorney would provide a USSG §5K1.1 letter citing

Roach's substantial assistance. *Id.*

On June 12, 1996, the U.S. Attorney's Office filed a request for "Reduction of Sentence

for Changed Circumstances" ("Request for Reduction") in light of Roach having "substantially

assisted the United States by providing valuable testimony in the trial of Carl Simon[.]" JA 809-

10. Roach pleaded guilty to second degree murder that same day and was sentenced to twenty

years in prison. JA 769-808, 811-12.

In February 2000, Simon filed a *pro se* petition for a writ of habeas corpus in the Superior

Court. JA 840-65. Gwendolyn Wilds, Esq. ("Wilds") was appointed to represent him, and she

filed an amended habeas petition.[6] Simon subsequently filed a motion to discharge Wilds which

was granted in January 2002, but the Superior Court declined to appoint new counsel. JA 13;

Appellant's Brief at 19-20. Then, by Memorandum Opinion dated July 18, 2002, the Superior

Court dismissed Simon's amended habeas petition. *Simon v. Gov't of the V.I.,* 47 V.I. 3 (V.I. Terr.

Ct. 2002). JA 5-37. Simon appealed the dismissal of his amended habeas petition to this Court in

July 2002, docketed as *Simon v. Gov't of the V.I.*, 3:03-cv-24 (the instant case). JA 1.

In January 2004, this Court appointed C. Beth Moss, Esq. ("Moss") to represent Simon

on the appeal of the dismissal of his amended habeas petition. (Dkt. No. 12 in 2003-cv-24). In

June 2004, Moss moved to withdraw as appellate counsel pursuant to *Anders v. California*, 386

---

[6] The Amended Petition is not included in the record on appeal.

U.S. 738 (1967). (Dkt. No. 17).[7] The motion was granted and Carolyn Hermon-Percell, Esq.

("Hermon-Percell") was appointed. (Dkt. No. 19).

In September 2005, Hermon-Percell also sought to withdraw by filing an *Anders* brief.

She identified seven possible issues for appeal, but found them to be without arguable merit.

(Dkt. No. 26; Dkt. No. 31 at 5). In a Memorandum Opinion dated September 10, 2007, while

Hermon-Percell's *Anders* Motion was pending, the Appellate Division remanded this case to the

Superior Court "to determine whether a Certificate of Probable Cause ["CPC"] should issue" in

order for the case to proceed on appeal. (Dkt. No. 31 at 6; Dkt. No. 32).[8]

The Superior Court issued a CPC in February 2008, finding that the late amendment of

the Information, the alleged *Brady* violation, "and other issues raised by Simon in his Amended

Petition for Writ of Habeas Corpus are deserving of consideration by the Appellate Division."

(Dkt. No. 34 at 5). However, in a Memorandum Opinion filed in August 2009, this Court—

apparently without considering the CPC previously issued by the Superior Court—affirmed the

Superior Court's July 2002 judgment denying Simon's petition for a writ of habeas corpus and

granted Hermon-Percell's *Anders* motion to withdraw as appellate counsel. (Dkt. Nos. 40, 41).

Simon appealed this Court's August 2009 Memorandum Opinion and Order to the Third

Circuit. (Dkt. No. 42). In an Opinion issued in May 2012, the Third Circuit held that, in light of

the CPC, the Appellate Division erred by finding that Hermon-Percell's *Anders* brief was

---

[7] Counsel may move to withdraw from representation of a client on appeal by submitting a brief pursuant to *Anders v. California*, 386 U.S. 738 (1967), stating, *inter alia*, that there are no meritorious issues for appeal.

[8] Pursuant to Virgin Islands Rule of Appellate Procedure 14(b), an appeal from the Superior Court's denial of a writ of habeas corpus "may not proceed unless the adjudicating judge of the Superior Court issues a certificate of probable cause." V.I.R. App. P. 14(b).

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 10

sufficient as a matter of law. *Simon v. Gov't of the Virgin Islands*, 679 F.3d 109 (3d Cir. 2012).

The Court concluded that there were "nonfrivolous issues that the Appellate Division should

have reviewed on the merits," including the issues discussed in the CPC. Accordingly, the Third

Circuit vacated this Court's August 2009 Order, and remanded for further proceedings. *Id.* at

115-16.

In October 2012, this Court granted Simon's motion to expand the CPC issued by the

Superior Court, and permitted him to address the following issues in his brief: (1) whether the

Government improperly withheld *Brady* material; (2) whether harmless error was the appropriate

standard of review to apply to an improper amendment of an Information; (3) whether the

alleged error involved in improperly amending the Information warranted reversal of Simon's

conviction; (4) whether the Information was constructively amended; and (5) whether Simon

received ineffective assistance of counsel. (Dkt. No. 62).[9] The Court also permitted Simon to

argue that the Superior Court lacked jurisdiction to hear his criminal case in the first instance.

(Dkt. Nos. 63, 86).

## II.   JURISDICTION AND STANDARD OF REVIEW

Title 5, Sections 1301-1325 of the Virgin Islands Code govern habeas corpus petitions

brought in Superior Court.  The statute provides that "[e]very person unlawfully imprisoned or

restrained of his liberty, under any pretense whatever, may prosecute a writ of habeas corpus, to

inquire into the cause of such imprisonment or restraint." 5 V.I.C. § 1301. Habeas corpus is

---

[9] This Court subsequently denied Simon's motion for release pending appeal (Dkt. No. 76), and issued an Order stating the matter would be decided based on the parties' submissions. (Dkt. No. 80).

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 11

warranted only in limited cases where violations of constitutional principles are implicated.

*Dowling v. Gov't of the V.I.*, 44 V.I. 256, 259 (Terr. Ct. 2002). Granting habeas relief is

> an extraordinary remedy. To prevail on a habeas appeal, the petitioner must establish an error of constitutional magnitude which had a substantial and injurious effect or influence on the proceedings. Even an error that may justify a reversal on direct appeal will not necessarily sustain a collateral attack. The burden is upon the petitioner to attack the validity of the judgment under which [he is] imprisoned.

*Hughley v. Gov't of the V.I.,* 2011 WL 4463309, at *1 (D.V.I. App. Div. Sept. 23, 2011), *aff'd*

536 F. App'x 278, 281 (3d Cir. 2013) (internal citations omitted). Habeas has been described as

"'a collateral remedy . . . not designed as a substitute for direct review.'" *Teague v. Lane*, 489

U.S. 288, 306 (1989) (quoting *Mackey v. United States*, 401 U.S. 667, 682-83 (1971)).

The Appellate Division of the District Court "has jurisdiction to review appeals from

final decisions of the Superior Court of the Virgin Islands concerning habeas petitions" in cases

filed prior to January 29, 2007. *Hughley,* 2011 WL 4463309, at *1; *see* V.I. Code Ann. tit. 4, §

33; Revised Organic Act of 1984, § 23A, 48 U.S.C. § 1613a(a) (providing District Court with

"appellate jurisdiction over the courts of the Virgin Islands established by local law to the extent

now or hereafter prescribed by local law"); *Martinez v. Stridiron*, 2011 WL 1483260, at *2 (V.I.

Mar. 22, 2011) (stating that, after January 29, 2007, "the Supreme Court of the Virgin Islands

assumed exclusive jurisdiction over appeals arising out of the Superior Court of the Virgin

Islands"); *Legislature of the V.I. v. DeJongh,* 52 V.I. 650, 645 F. Supp. 2d 452, 457 (D.V.I. App.

Div. 2009) (establishing the Supreme Court of the Virgin Islands to review decisions of the

Superior Court after Jan. 29, 2007). Simon's habeas petition was filed in the Superior Court in

February 2000. Accordingly, this Court, sitting in its appellate capacity, has jurisdiction to hear

Simon's appeal from the dismissal of his amended habeas petition by the Superior Court.

"A trial court's conclusions of law in dismissing a petition for writ of habeas corpus are subject to plenary review." *Mendez v. Gov't of the V.I.*, 56 V.I. 194, 199 (V.I. 2012) (citing *Villot v. Varner*, 373 F.3d 327, 331 (3d Cir. 2004)). This Court reviews "a trial court's findings of fact only for clear error." *Hughley*, 2011 WL 4463309, at *2. A finding of fact is clearly erroneous when it is "completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data." *Berg Chilling Sys., Inc. v. Hull Corp.*, 369 F.3d 745, 754 (3d Cir. 2004) (internal quotation marks omitted).

## III.  DISCUSSION

### A.  *Brady* Violation

Simon argues that the Government of the Virgin Islands improperly withheld *Brady* material from him and his counsel before his trial. Specifically, he contends that: (1) a quid pro quo agreement was reached between Roach and the U.S. Attorney's Office, which provided that Roach would abandon his then-pending appeal of his first-degree murder conviction and would testify against Simon in exchange for a reduced sentence; and (2) this agreement was memorialized in the September 1, 1995 Stipulation between the U.S. Attorney's Office and Roach's counsel recommending vacatur of Roach's first-degree murder conviction and allowing him to re-plead to second-degree murder. Appellant's Brief at 22, 26. Simon maintains that statements made at Roach's June 12, 1996 resentencing hearing, plus the Stipulation and the August 1, 1995 §5K1.1 letter from the AUSA,[10] are "clear evidence that there was an agreement that had been struck" with Roach that was never disclosed. Appellant's Brief at 26-28.

---

[10] The August 1, 1995 §5K1.1 letter is not part of the record on appeal. Appellee's Brief at 7.

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 13

The Government denies that it improperly withheld *Brady* material. It counters that the Stipulation was signed more than seven months after Simon's conviction and Roach was re-sentenced almost two and one-half years after Simon's conviction.[11] Appellee's Brief at 6-7. The Government further asserts that the United States, not the Government of the Virgin Islands, prosecuted Roach; that the two entities are separate sovereigns; and that nothing in the record shows when the Assistant Attorney General prosecuting Simon learned of the agreement between the AUSA and Roach.[12] *Id.* at 8-9. The Government concludes that Simon has not met his burden of demonstrating that it suppressed information of the settlement. The Government also adds that Roach's credibility was vigorously attacked at trial; impeachment by any such agreement would be cumulative;[13] and the evidence at trial was sufficient to convict Simon. Appellee's Brief at 9-10.

### 1.  Legal Standard

In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment[.]" *Brady*, 373 U.S. at 87. "'[T]o establish a *Brady*

---

[11] Actually, Roach's re-sentencing occurred one and one-half years after Simon's conviction. Simon was convicted in January 1995 and Roach was re-sentenced in June 1996.

[12] At the time Roach was prosecuted, the United States Attorney prosecuted certain Virgin Islands crimes. Simon was prosecuted by the Attorney General of the Virgin Islands. The Government has argued that the United States and Virgin Islands were two separate sovereigns, and therefore any knowledge by the United States of an agreement that may have been reached with Roach could not be imputed to the Virgin Islands for *Brady* purposes. The Court need not reach this argument in light of its conclusion that Simon has failed to establish that there was, in fact, an agreement between Roach and the Government prior to Simon's trial. *See infra* at 14-18.

[13] Again, the Court need not reach the Government's cumulative evidence argument in view of the conclusion reached here that no agreement between Roach and the Government prior to Simon's trial has been shown.

violation requiring relief, a defendant must show that (1) the government withheld evidence, either willfully or inadvertently; (2) the evidence was favorable, either because it was exculpatory or of impeachment value; and (3) the withheld evidence was material."' *United States v. Walker*, 657 F.3d 160, 185 (3d Cir. 2011) (quoting *Lambert v. Blackwell*, 387 F.3d 210, 252 (3d Cir. 2004)). The burden of establishing a *Brady* violation falls on the defendant. *Maynard v. Gov't of the V.I.*, 392 F. App'x 105, 119 (3d Cir. 2010) (citing *United States v. Pelullo*, 399 F.3d 197, 209 (3d Cir. 2005)).

### 2.   Analysis

Simon's argument falters on the first prong of the *Brady* analysis: he cannot show that an agreement actually existed between Roach and the prosecution before his trial, and therefore he cannot demonstrate that the Government withheld evidence of such an agreement. Simon relies on documents that do not support his quid pro quo theory, and statements that are equivocal at best and not made under oath, to prove that such an agreement existed. Simon simply extrapolates backward from the September 1995 Stipulation and June 1996 Request for a Sentence Reduction and Hearing, and concludes that an agreement had to have been in place before Roach testified. But those documents, plus statements Roach's counsel made at the resentencing hearing, do not meet Simon's burden of proving that fact. *See United States v. Freeman*, 763 F.3d 322, 346-47 (3d Cir. 2014) (finding that documents that post-date trial fail the first prong of the *Brady* analysis).

By its terms, the September 1995 Stipulation set forth one condition that Roach had to meet before the AUSA would stipulate to vacate Roach's first-degree murder conviction and charge second-degree murder: Roach had to withdraw his appeal to the Third Circuit Court of

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 15

Appeals. JA 760. Roach moved to dismiss his appeal on March 20, 1995, and the appeal was

dismissed on May 1, 1995. U.S.C.A. Appeal No. 94-7284.  Both the condition precedent to the

Stipulation (withdrawing the appeal), and the Stipulation itself, occurred months *after* Roach

testified at Simon's trial. While the Stipulation also referred to Roach having rendered

substantial assistance at Simon's trial, nothing in the Stipulation indicates that his testimony at

Simon's trial was a pre-condition to the agreement to reduce Roach's sentence. Similarly,

nothing in the June 1996 Request for a Sentence Reduction indicates that the prosecutor reached

any agreement with Roach, prior to Simon's trial, in exchange for his testimony. JA 809.

Simon points to certain statements made by Roach's counsel at the June 1996

resentencing as support for his position that the agreement to reduce Roach's sentence was

reached before Roach testified. For the resentencing court's benefit, Roach's attorney "fill[ed] in

some gaps" with regard to what had occurred after Roach was convicted. JA 773. Roach's

counsel stated, "*[a]fter* we had filed our appeal, . . . we were approached by the Government and

we agreed with regards to that matter to testify in the Territorial Court. *Upon* our testimony in

the Territorial Court, we agreed and we stipulated to vacate the conviction for first degree

murder" based on Roach's testimony against Simon and because Roach had given "substantial

information." *Id.* (emphasis added).

This statement describes a two-step process in reaching the agreement to vacate the

conviction for first-degree murder. First, at some unidentified time after Roach filed his appeal

on May 20, 1994, he agreed to testify. However, counsel's statement does not indicate that the

agreement to testify was predicated on some benefit for doing so. Second, sometime after Roach

testified, his counsel and the AUSA agreed and stipulated to vacate Roach's first-degree murder

conviction. Roach's counsel explicitly stated that the agreement to reduce Roach's sentence occurred "[u]pon our testimony"—not before he testified.

At the resentencing, Roach's counsel also stated that "immediately" after Roach was convicted, Roach expressed his desire to cooperate, and "[s]ubsequently, [the U.S. Attorney] and myself we agreed that this [Stipulation] may be the best mechanism in terms of the interest of justice." JA 796. Here, also, two time frames are mentioned: the first was when Roach expressed a general interest in cooperating, which occurred "immediately" after Roach's conviction on May 5, 1994. The second time frame was highlighted by counsel's use of the word "subsequently," indicating that, at some unidentified time after Roach expressed interest in cooperating, his counsel and the Government decided that a stipulation would be the "best mechanism" to achieve the "interest of justice." There is, however, no indication that the agreement to reduce Roach's sentence occurred prior to Roach's testimony in the Simon case.

These statements from the resentencing hearing, as well as others upon which Simon relies, Appellant's Brief at 27-28, merely refer to the uncontested fact that a stipulation was reached. None of the statements establish that the agreement to reduce Roach's sentence occurred before Roach testified. In fact, the only definitive statement is Roach's testimony to the contrary—that the benefit he received prior to his testimony was protection, and that there were no other promises made to him for his testimony by the Government. JA 390.

At bottom, the Court is left with Simon's speculation that a deal *must* have been struck with Roach *before* he testified because he eventually received a benefit *after* he testified. But such speculation is not sufficient to invoke *Brady. See Strickler v. Greene*, 527 U.S. 263, 286 (1999) ("Mere speculation that some exculpatory material may have been withheld is unlikely to

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 17

establish good cause for a [*Brady*-related] discovery request on collateral review."); *Maynard,*

392 F. App'x at 116-17 (rejecting conjecture as a basis for a *Brady* challenge); *United States v.*

*Ramos*, 27 F.3d 65, 71 (3d Cir. 1994) (stating that it was "unwise to infer the existence of *Brady*

material based upon speculation alone").

Moreover, the Superior Court's conclusion in its July 2002 habeas Memorandum

Opinion—that "the fact that the United States cited Roach's cooperation in the Territory's

prosecution of Simon as a factor in its request for a reduction in sentence does not, in and of

itself, establish the existence of a *quid pro quo* between the United States or the Government of

the Virgin Islands and James Roach," JA 32-33—is well-supported by case law. The Third

Circuit came to a similar conclusion in *United States v. Freeman*. In *Freeman*, the defendant

alleged a *Brady* violation on direct appeal based on the fact that, several years after his

conviction, during a trial of several co-defendants, he became aware of numerous letters written

by key witnesses who had testified against him at his trial. One group of letters allegedly

discussed agreements between the government and cooperating witnesses, and detailed the

consideration they would receive in exchange for their testimony and cooperation. None of these

letters had been produced to defense counsel. The Third Circuit reviewed the letters and found

that they post-dated the defendant's trial. The Court concluded that "[b]ecause there is no record

evidence that the letters even existed at the time of [defendant's] trial, he cannot, therefore,

establish prejudice as a result of the government's non-disclosure," and that the claim "fail[ed] at

the first prong of the *Brady* analysis." *Freeman*, 763 F.3d at 346-47.

Other courts have ruled similarly. For example, the Sixth Circuit, in *Akrawi v. Booker*,

572 F.3d 252 (6th Cir. 2009), found: "[T]he mere fact of favorable treatment received by a

witness following cooperation is also insufficient to substantiate the existence of an agreement.

'[I]t is not the case that, if the government chooses to provide assistance to a witness following

trial, a court must necessarily infer a preexisting deal subject to disclosure under *Brady*.'" *Id.* at

263 (quoting *Bell v. Bell*, 512 F.3d 223, 234 (6th Cir. 2008)); *see also United States v. Winston,*

372 F. App'x 17, 19 (11th Cir. 2010) (same); *Shabazz v. Artuz*, 336 F.3d 154, 165 (2d Cir. 2003)

(observing that "the fact that a prosecutor afforded favorable treatment to a government witness,

standing alone, does not establish the existence of an underlying promise of leniency in exchange

for testimony"); *Rivera v. Nolan*, 596 F. Supp. 2d 162, 170 (D. Mass. 2009) (pointing out that

merely because prosecution witness "ultimately received consideration" does not establish that

the prosecution had struck a deal with the witness before he testified).

It is a defendant's burden to prove that a *Brady* violation existed. For the foregoing

reasons, the Court finds that Simon has not carried his burden on the first *Brady* prong of

showing that the Government withheld evidence of a cooperation agreement that existed before

Roach testified. Finding no error in the Superior Court's conclusion in this regard, we affirm the

holding of the Superior Court that Simon has not established the existence of a quid pro quo

agreement between the Government and Roach, and reject Simon's appeal of his *Brady* claim on

that basis.[14]

### B. The Amended Information

In his amended habeas petition, Simon argued that, after nine months of proceeding on an

Information charging first-degree murder and burglary, "the government's improper amendment

---

[14] Because Simon has not carried his burden to show the existence of a pre-existing agreement
between the Government and Roach, we do not reach the second or third prongs of the *Brady*
analysis.

of the Information on the day of trial prejudiced his ability to prepare adequately for trial." JA

13. Simon claimed that he should have been afforded an additional thirty days to prepare his

defense to the new robbery charge. JA 14. The Superior Court ruled, *inter alia*, that: (1) while

the amendment of the Information to include robbery violated the language of Fed. R. Crim. P.

7(e) in that an additional offense was charged,[15] the error was harmless beyond a reasonable

doubt; (2) the substitution of felony murder for premeditated murder did not amount to charging

a different offense; (3) Simon had adequate notice—almost two weeks—that the Government

intended to amend the Information to include a robbery charge; (4) there was a "significant

overlap" between the robbery offense and other charged offenses, and the facts giving rise to the

robbery offense took place within the same narrow time frame and location as the burglary

offense; and (5) Simon's counsel had adequate time to review Roach's prior testimony for any

impeaching statements when preparing to defend against the additional robbery offense. JA 13-

25, 36.

  In challenging the amendment of the Information on appeal, Simon advances three

arguments.

  First, Simon claims that because the Information was constructively amended, he is

entitled to habeas relief, regardless of whether the standard of review is harmless error or plain

error.[16] According to Simon, "a constructive amendment is 'per se error' in the harmless error

---

[15] The Federal Rules of Criminal Procedure are applicable to the Superior Court through Rule 7 of the Rules Governing the Superior Court of the Virgin Islands. Fed. R. Crim. P. 7(e) provides that an information may be amended at any time before verdict unless an additional or different offense is charged or a substantial right of the defendant is prejudiced.

[16] This Court's October 2012 Order permitted Simon to argue whether harmless error was the appropriate standard of review to apply to amendment of the Information. (Dkt. No. 62).

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 20

context *and* satisfies the 'affects substantial rights' prong of the plain error test." Appellant's

Brief at 31 (citing *United States v. Syme*, 276 F.3d 131, 153 n.7 (3d Cir. 2002)). Thus, Simon's

first argument is based on the premise that the Information was constructively amended. Because

this premise is fatally flawed, Simon's first argument must be rejected.

The Third Circuit has held that "[t]he rule against constructive amendments arises under

the Fifth Amendment, and protects the 'constitutionally guaranteed role of the grand jury.'"

*United States v. Vosburgh*, 602 F.3d 512, 532 n.20 (3d Cir. 2010) (quoting *United States v.*

*Daraio*, 445 F.3d 253, 261 (3d Cir. 2006)).[17] As the court in *Vosburgh* noted:

> 'An indictment is constructively amended when, in the absence of a formal
> amendment, the evidence and jury instructions at trial modify essential terms of
> the charged offense in such a way that there is a substantial likelihood that the
> jury may have convicted the defendant for an offense differing from the offense
> the indictment returned by the grand jury actually charged.'

*Id.* at 532 (quoting *Daraio*, 445 F.3d at 259-60). "An indictment can be constructively amended

through 'evidence, arguments, or the district court's jury instructions' if they 'effectively amend

the indictment by broadening the possible bases for conviction from that which appeared in the

indictment.'" *Id.* (quoting *United States v. McKee*, 506 F.3d 225, 229 (3d Cir. 2007)). On the

other hand, "[i]f a defendant is convicted of the same offense that was charged in the indictment,

there is no constructive amendment." *Id.*; *see also United States v. Miller,* 471 U.S. 130, 136

(1971) ("Convictions generally have been sustained as long as the proof upon which they are

---

[17] The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or
otherwise infamous crime, unless on a presentment or indictment of a Grand Jury[.]" U.S. Const.
amend. V. Because of this constitutional guarantee, "a court cannot permit a defendant to be tried
on charges that are not made in the indictment against him." *Stirone v. United States*, 361 U.S.
212, 217 (1960).

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 21

based corresponds to an offense that was clearly set out in the indictment."). Even assuming the general applicability of the constructive amendment concept in the context of an information—rather than an indictment—Simon's argument must fail.[18]

The Government first informed Simon, at a January 10, 1995 pre-trial conference, that it intended to amend the Information to include a robbery count. JA 87. On January 13th, the Government gave Simon a copy of an Amended Information that changed the first-degree murder count to felony murder, and added a conspiracy and a robbery count. JA 96, 121. The Government filed its motion to amend the Information on January 18, 1995. JA 130. At a January 23, 1995 pretrial conference, the judge granted the Government's motion to again amend the Information, with the understanding that the Government would remove the conspiracy count, and conform the language in the murder and burglary counts to reflect the elements of felony murder and burglary. JA 144-52. The approved Second Amended Information was filed on January 25, 1995. JA 750-52.

Based on this set of facts, the Court finds that the Information was not constructively amended. At the pretrial conference on January 23rd—before any testimony was taken at trial and before any arguments were made to the jury or jury instructions given—the Information was

---

[18] Simon has provided no legal authority which addresses the applicability of the constructive amendment concept to an information. There are significant differences between the two charging documents, most importantly that an indictment is brought by a grand jury under the Fifth Amendment, while an information is brought solely by a prosecutor. *See Gov't of the V.I. v. Bedford,* 671 F.2d 758, 765 n.11 (3d Cir. 1982) ("The difference between amending an information and amending an indictment was explained long ago by Lord Mansfield: 'There is a great difference between amending indictments and amending informations. Indictments are found upon the oath of a jury, and ought only to be amended by themselves; but informations are as declarations in the king's suit. An officer of the crown has the right of framing them originally, and may, with some, amend in like manner as any plaintiff may do.'") (quoting *Rex v. Wilkes*, 4 Burr. 2527 (1770)).

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 22

amended to reflect the charges of which Simon was subsequently convicted. Because the charges

accepted by the Court at the January 23rd pretrial conference were memorialized in the Second

Amended Information and constitute the offenses on which Simon was tried and convicted, there

was no constructive amendment. The absence of a constructive amendment negates the premise

upon which Simon's first argument is predicated and renders the argument groundless.

Simon next argues that, in applying the harmless error standard, the Superior Court's

conclusion that he had adequate notice that the Government intended to amend the Information

to include a robbery charge is misguided, and he was prejudiced because his attorney could not

mount a meaningful defense. Appellant's Brief at 31-32. As support for this conclusion, Simon

cites Ayala's comment prior to jury selection on January 23, 1995 that he did not have "the time

to be able to investigate and corroborate certain of the facts or some of the elements necessary to

prove those charges . . ." JA 144. This argument is unavailing.

In addressing Simon's argument, the Superior Court pointed out that, given that the

linchpin of the Sixth Amendment is notice, it was clear that Simon had "adequate notice—almost

two weeks" that the Government intended to amend the Information to add the robbery charge.

JA 24-25. The court rejected Simon's contention that counsel had no time to prepare for the

additional robbery defense, finding that counsel had "adequate time to review Roach's prior

testimony for any impeaching statements." *Id.* at 25. The Superior Court observed that Simon

received *actual notice* of the robbery charge almost two weeks before trial, "thereby giving

defense counsel at least thirteen days' notice of the government's new theory." JA 20 n.7. The

court went on to say that "[o]ther courts have found no violation of a defendant's sixth

amendment right to notice in even narrower time frames," citing cases. *Id.*[19]  The court also

highlighted the fact that Simon "never singled out any additional statements that were made by

Roach in the district court that would have further impeached his testimony at Simon's trial." *Id.*

at 25 n.12.

Moreover, the Superior Court found that "the factual posture of the case militates in favor

of harmless error" because of the "significant overlap between the robbery offense and the other

charged offenses. The facts that gave rise to the robbery offense took place within the same

narrow time frame and location—namely, between Simon's entry into Ezeki[e]l's house and his

exit—as the burglary offense." *Id.* at 25. As a result, the Superior Court concluded that few

evidentiary matters or defenses that Simon raised would have been undermined by the new

charge. The Superior Court further added that even if counsel had requested a continuance, it

was "difficult to imagine how defense counsel would have proceeded differently." *Id.*

---

[19] In his direct appeal, Simon argued that the Superior Court erred in allowing the Government to amend the Information by substituting felony murder for first-degree murder and adding robbery. JA 824. This Court held that "felony murder is simply one means of proving a first degree murder," and because it was not "a different or additional offense from first degree murder, no substantial right of the defendant was prejudiced." JA 824-25 (citing cases). This Court did not address the amendment which added the robbery charge. The Superior Court on habeas review adopted the holding of this Court on direct appeal in finding that substitution of felony murder for premeditated murder did not amount to the charging of a different offense, JA 20, and focused solely on the effect of adding the robbery charge. JA 20-25. In the instant appeal, Simon argues both that adding the robbery charge and changing the theory of the murder charge constituted improper amendments to the Information. Appellant's Brief at 32. Since Simon's argument regarding the alleged impropriety of the amendment of the Information from premeditated murder to felony murder was rejected on direct appeal, this Court need not consider the issue. *See George v. Wilson*, 2013 WL 5819098, at *3 (V.I. Oct. 28, 2013) (declining to grant habeas petition because issues presented in the writ had already been determined on direct appeal) (citing *Rodriguez v. Bur. of Corrs.*, 2013 WL 1808403, at *5, 58 V.I. 367, 367-77 (V.I. Apr. 29, 2013)). Even if the Court were to reach the issue, the case law cited by this Court on direct appeal clearly holds that "felony murder is simply one means of proving a first degree murder," and thus the amendment of the Information to substitute felony murder did not violate Simon's constitutional rights. JA 824.

Exercising plenary review of the legal issues, and clearly erroneous review of the factual

issues, this Court finds no error with the Superior Court's conclusion that Simon had sufficient

notice of the new charges to prepare his case, and that he was not prejudiced by the amendment

of the Information.

The Superior Court properly analyzed Simon's claim under the Sixth Amendment and

supported its conclusion with adequate citations to case law. Simon's actual notice of the

amendment on January 10, 1995—almost two weeks before trial—did not violate his Sixth

Amendment right to notice of the charges against him. *See Hawkinson v. Zavaras*, 427 F. App'x

653, 658 (10th Cir. 2011) (finding that pretrial hearing gave ample notice to defendant of charges

he was facing and afforded him opportunity to defend against those charges); *Heiss v. Berghuis*,

2015 WL 1001535, at *11 (W.D. Mich. Mar. 5, 2015) (finding that prosecutor sending notice of

added charge to defense attorney, and discussion of that charge at pretrial hearing nearly a week

before trial, provided fair notice of charges against defendant and did not warrant habeas relief).

Simon also argues that if Ayala had additional time to devote to the case, he would have

been able "to effectively attack the testimony of Roach" or find two police officers whose

testimony allegedly would have helped his defense. Appellant's Brief at 32. These arguments are

entirely speculative. *See Rolan v. Vaughn*, 445 F.3d 671, 682 (3d Cir. 2006) (in context of

*Strickland* analysis concerning whether result of proceeding would have been different,

defendant's showing of constitutional violation "may not be based on mere speculation about

what the witnesses [that counsel] failed to locate might have said") (internal quotation marks

omitted). Simon has not pinpointed on appeal what additional challenges he could have made to

Roach's testimony once the Information was amended that he could not have made earlier when

the charges were simply murder and burglary under the original Information. In other words, the need to effectively attack Roach's testimony or to find the police officers with allegedly helpful evidence—which Simon claims necessitated more time—did not arise as a result of the amendment of the Information. The importance of any such testimony applied equally to the original Information.[20]

In sum, none of Simon's arguments demonstrate that the Superior Court erred when it concluded that he had constitutionally adequate notice regarding the amendment of the Information to add the robbery charge; that he had sufficient time to defend against that offense; and that his substantial rights were not prejudiced. JA 25. Accordingly, this Court rejects Simon's second argument that he did not have adequate notice of the amendment and therefore his counsel was hampered from providing an adequate defense.

With regard to Simon's third argument—that because he was convicted of two counts upon which he was never arraigned, he was subjected to constructive amendment of the Information—the Court also finds this contention without merit. Simon claims that not being arraigned on charges on which he was tried constitutes prejudice affecting his substantial rights. Consequently, his convictions for felony murder and robbery must be vacated. Appellant's Brief at 38-39. Simon's counsel never raised this objection at trial and, in any event, case law does not support Simon's conclusion.

---

[20] Even if Ayala—contrary to his testimony, *see infra* at 38—had decided that calling the police officers would have been important to Simon's case, it is not logical to assume that he would have refrained from investigating this matter during the eight months between the filing of the original Information and the date of trial, and would have waited until the Government announced its intention to amend the Information, two weeks before trial, to explore this angle. Whether Simon was present at the scene would have been as relevant for the murder and burglary counts as it would have been for felony murder and robbery. Simon's premise is both speculative and faulty.

Over one hundred years ago, in *Garland v. Washington*, 232 U.S. 642 (1914), the

Supreme Court held that "it cannot for a moment be maintained that the want of formal

arraignment [on a second information] deprived the accused of any substantial right, or in any

wise changed the course of trial to his disadvantage." *Id.* at 645. The Court went on to say that

"such strict adherence to the mere formalities of trial" is not required under the Due Process

Clause." *Id.* at 646.

Numerous Circuit Courts have cited *Garland* in rejecting defendants' arguments on direct

appeal that failing to dismiss a superseding indictment for failure to arraign, or simply failing to

arraign on a superseding indictment, constituted grounds for reversal of a conviction.[21] In *United

States v. McGee*, __ F. App'x __, 2015 WL 3451860 (9th Cir. June 1, 2015), the Ninth Circuit

found that the district court did not err in denying McGee's motion for a new trial based on

failure to arraign him on the superseding indictment, as this was a "technical error, which does

not require reversal, since McGee was fully aware of the charges against him, and heard them

from his counsel and the district court during trial." *Id.* at *2; *see also United States v. Solomon*,

581 F. App'x 270, 272 (4th Cir. 2014) (finding that failure to arraign on superseding indictment

is "technical noncompliance with the procedural requirements" of Fed. R. Crim. P. 10 governing

arraignments, and "does not warrant reversal of a conviction if not raised before trial," citing

*United States v. Reynolds*, 781 F.2d 135, 136 n.2 (8th Cir. 1986), and that "[a] failure to arraign

only warrants a reversal if it causes prejudice or impairs a substantial right," quoting *United

States v. Williams*, 152 F.3d 294, 299 (4th Cir. 1998) (citing *Garland*, 232 U.S. 642); *United*

---

[21]  Simon's contention that "the continued viability of *Garland* is necessarily suspect," Appellant's Brief at 36, is belied by the bevy of cases up through the present that have followed its teaching.

*States v. Correa-Ventura*, 6 F.3d 1070, 1073 (5th Cir. 1993) (under Fed. R. Crim. P. 10, arraignment was required so a defendant could be informed of the substance of the charges against him, to be given an opportunity to plead to them, and to prepare a defense; but "a conviction will not be vacated for lack of formal arraignment proceedings unless possible prejudice is shown."); *United States v. Joyner*, 201 F.3d 61, 79 (2d Cir. 2000) (assessing issue of failure to arraign on superseding indictment in context of double jeopardy, and citing *Garland*).

Having shown no prejudice or impairment of a substantial right, and given that Simon had adequate notice of the charges against him and an opportunity to defend, the Court finds meritless Simon's third argument that, because he was convicted of two counts upon which he was never arraigned, the Information was constructively amended.

Accordingly, finding no error in the Superior Court's conclusion, we affirm the court's ruling that the amendment of the Information did not violate Simon's Sixth Amendment constitutional rights and reject Simon's Amended Information argument on appeal as groundless.

## C. Superior Court Jurisdiction

Simon maintains that the Superior Court did not have jurisdiction over his trial for first-degree murder because the crime occurred in 1993, prior to the Superior Court obtaining jurisdiction over local first-degree murder cases on January 1, 1994. Appellant's Brief at 32-37.

Challenges to the jurisdiction of a court can be raised at any time. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006) (jurisdiction can be raised at "any stage in the litigation, even after trial and the entry of judgment"). Prior to 1994, the Superior Court had "no power to hear first-degree murder cases." *Gov't of the V.I. v. Colbourne*, 1994 WL 737179, at *1, 31 V.I. 22 (Terr. Ct. Nov. 25, 1994). The Virgin Islands Legislature expanded the Superior Court's

jurisdiction, effective January 1, 1994, with the enactment of 4 V.I.C. § 76(b), which provides

that "the Territorial Court shall have original jurisdiction in all criminal actions."

In addressing Simon's challenge to the Superior Court's jurisdiction, the *Colbourne* case

is directly on point. It instructs that the proper inquiry is not when the crime occurred, but when

the case was filed. *See Colbourne*, 1994 WL 737179 at *3 ("The fact that [the alleged offense]

happened before the Court had jurisdiction is immaterial"; "As long as the Government's

criminal action was filed after jurisdiction passed to the [Superior] Court, the [Superior] Court

had jurisdiction over the matter.") (internal quotation marks and citations omitted); *cf. Callwood

v. Enos*, 230 F.3d 627, 631 (3d Cir. 2000) (noting that a criminal proceeding was properly before

the District Court, rather than the Superior Court, when the matter was filed before January 1,

1994).

Thus, the issue is whether the criminal action against Simon was filed in Superior Court

after January 1, 1994—the date on which that court obtained jurisdiction to hear all criminal

cases. Here, the initial Information was filed, and the action was commenced, on May 25, 1994,

over four months after the Superior Court's expanded jurisdiction over criminal cases became

effective. JA 39. Therefore, the matter was properly before the Superior Court, and Simon's

challenge on this ground is without merit.

Simon also contends that the Superior Court lacked jurisdiction over Counts I (felony

murder) and II (robbery) of the Second Amended Information because he was never arraigned on

that iteration of the Information and never entered a plea pursuant to Fed. R. Crim. P. 10. He

acknowledges that failure to be arraigned on a superseding charge is not necessarily error if no

substantive changes are made to the charging document. Appellant's Brief at 36. However, he

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 29

asserts that since substantive changes were made here, the failure to arraign him on the new

Information was fatal and his conviction must be reversed. *Id.* at 35-36.

Simon does not explain how his argument in this regard amounts to a jurisdictional

challenge or how the essence of the argument differs in any material respect from his various

challenges to the Amended Information. In any event, whether couched as a constructive

amendment issue, Appellant's Brief at 37, or a jurisdictional issue, Appellant's Brief at 35-37,

the argument fails. The notion that the crux of the issue here is whether Simon had adequate

notice and an opportunity to defend or whether the failure to arraign resulted in prejudice to

Simon is neither new or novel. As discussed earlier, from over a century ago in *Garland v.*

*Washington*, 232 U.S. 642 (1914), to the present time, courts have adopted and applied these

principles in addressing challenges of the nature raised by Simon.

Simon also claims to have suffered prejudice by not having "an adequate opportunity to

defend himself of the new and amended charges." Appellant's Brief at 37. The Court has

previously rejected this argument in the context of addressing the Amended Information. This

argument fares no better here when couched in jurisdictional terms.

In view of the foregoing, the Court rejects Simon's jurisdictional arguments.

**D.   Ineffective Assistance of Counsel**

Simon did not properly raise an ineffective assistance of counsel claim in his habeas

petition,[22] and the Superior Court's Certificate of Probable Cause did not address such a claim.

---

[22] In a footnote at the conclusion of its Memorandum Opinion, the Superior Court observed that
Simon had "obliquely" raised the issue of ineffective assistance of trial counsel, but had argued
that any deficient performance was excusable because it was attributable to alleged prosecutorial
misconduct and the trial court's erroneous application of Fed. R. Crim. P. 7(e). The Superior

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 30

(Dkt. No. 34). In its May 16, 2012 Amended Opinion, the Third Circuit analyzed whether the

Appellate Division of this Court "erred in applying the procedures of *Anders v. California*, 386

U.S. 738 (1967) to assess the motions filed by court-appointed counsel to withdraw from

representing Simon on post-conviction appeal." *Simon*, 679 F.3d at 113. In its analysis, the Third

Circuit noted that Simon had raised other issues, such as ineffective assistance of counsel, "that

counsel may also choose to address upon remand." *Id.* at 116. In response, this Court issued an

October 2012 Order expanding the CPC to permit Simon to address, *inter alia*, "[w]hether [he]

received ineffective and/or deficient assistance of counsel." (Dkt. No. 62). Accordingly, this

Court will address those claims in the first instance.[23]

        In his brief on appeal, Simon contends that several attorneys who represented him in this

case (and in another case), at the trial, appellate, and habeas levels, provided him with ineffective

───────────────────────────────

Court concluded that because Simon did not put "the issue of counsel's performance directly
before this Court, there is no need to address this claim on the merits." JA 37, n.19.

[23] In his brief, Simon quotes *United States v. McLaughlin* in which the Third Circuit observed
that ineffective assistance of counsel claims are not generally entertained on *direct appeal*
because such claims often "involve questions regarding conduct that occurred outside the
purview of the district court and therefore can be resolved only after a factual development at an
appropriate hearing." Appellant's Brief at 39 (quoting *United States v. McLaughlin*, 386 F.3d
547, 555-56 (3d Cir. 2004)). The Court went on to say that if the record was sufficient to
adjudicate such a claim on direct appeal, an evidentiary hearing was not necessary. *Id.* Simon
does not argue before this Court that his ineffective assistance of counsel arguments should be
addressed in an evidentiary hearing in the first instance. In fact, Simon's brief contains numerous
quotations from a May 21, 2003 evidentiary hearing in District Court which included testimony
from Simon and Ayala concerning an ineffective assistance of counsel claim against Ayala
contained in another of Simon's habeas petitions. Appellant's Brief at 40-41, 44. In view of the
record here, even if Simon were to argue that an evidentiary hearing was necessary before this
Court could address his ineffective assistance claims, such an argument would be meritless—
except in the case of Attorney Michael Joseph, as discussed *infra*. With regard to Ayala, such a
hearing has already taken place, and the parties have included the transcript in the instant record
on appeal and referred to it in their arguments. JA 902-1021. With regard to the other attorneys,
except Joseph and Arturo Watlington, Esq., the record is otherwise sufficient.

assistance. He claims ineffective assistance by Augustin Ayala, Esq. in the Superior Court trial;

Harold Willocks, Esq. on direct appeal of his Superior Court conviction to the Appellate

Division of the District Court; Michael A. Joseph, Esq., on the direct appeal to the Appellate

Division and the appeal of the Appellate Division opinion to the Third Circuit; Arturo

Watlington, Esq. ("Watlington"), in the appeal of a separate habeas petition; and Gwendolyn R.

Wilds, Esq., in representing him before the Superior Court in his habeas petition.

"The right to effective assistance of counsel in certain criminal proceedings is guaranteed

by the Sixth Amendment of the Constitution as extended to the Virgin Islands by section 3 of the

Revised Organic Act of 1954 . . . § 3, 48 U.S.C. § 1561." *Hughley*, 2011 WL 4463309, at *2.

Under *Strickland v. Washington*, 466 U.S. 668 (1984), there are two components to an

ineffective assistance of counsel inquiry. The petitioner bears the burden of establishing both

components. *Id.*

First, "'the defendant must show that counsel's representation fell below an objective

standard of reasonableness.'" *Gov't of the V.I. v. Vanterpool*, 767 F.3d 157, 165 (3d Cir. 2014)

(quoting *Strickland*, 466 U.S. at 688). This inquiry "is necessarily linked to the practice and

expectations of the legal community." *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010). But a "fair

assessment of attorney performance requires that every effort be made to eliminate the distorting

effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to

evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Courts

scrutinizing the reasonableness of an attorney's conduct must examine counsel's overall

performance, both before and at trial, and must be highly deferential to the attorney's judgments.

*Id.* at 688-89. The proper inquiry is "whether, in light of all the circumstances, the identified acts

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 32

or omissions were outside the wide range of professionally competent assistance." *Id.* at 690.

"[T]he proper measure of attorney performance remains simply reasonableness under prevailing

professional norms," *Hughley*, 2011 WL 4463309 at *2 (internal quotation marks omitted).

Second, a defendant must prove prejudice by showing that there is a reasonable

probability that, "but for counsel's unprofessional errors, the result of the proceeding would have

been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient

to undermine confidence in the outcome. That requires a 'substantial,' not just 'conceivable,'

likelihood of a different result." *Vanterpool*, 767 F.3d at 165 (citing *Cullen v. Pinholster*, 131 S.

Ct. 1388, 1403 (2011)). A "purely outcome determinative perspective is inappropriate." *United*

*States v. Livingston,* 425 F. Supp. 2d 554, 558 (D. Del. 2006) (citing *Lockhart v. Fretwell*, 506

U.S. 364, 369 (1993)).

In applying *Strickland*, "the court is not engaging in a prophylactic exercise to guarantee

each defendant a perfect trial with optimally proficient counsel, but rather to guarantee each

defendant a fair trial, with constitutionally competent counsel." *Marshall v. Hendricks*, 307 F.3d

36, 85 (3d Cir. 2002).

### 1. Augustin Ayala, Esq.

Attorney Ayala represented Simon during his January 1995 trial in Superior Court. In

addition to the trial transcript, which provides insight into Ayala's representation, the record on

appeal includes the transcript of a May 21, 2003 evidentiary hearing before District Court Judge

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 33

Raymond L. Finch at which both Simon and Ayala testified regarding an ineffective assistance

of counsel claim against Ayala that Simon raised in a separate habeas petition. JA 902-1021.[24]

Simon asserts that Ayala rendered ineffective assistance on numerous grounds—none of

which the Court finds persuasive. The Court will address each argument in turn.

a. Ayala's Characterization of His Representation

First, Simon points to certain statements by Ayala during the May 2003 hearing that

Ayala considered his representation ineffective. Appellant's Brief at 40-41. Ayala testified that,

shortly before the Simon trial, he had transferred from the Federal Public Defender's Office to

the Territorial Public Defender's Office, and that no one in his new office "wanted to or was

willing to assist or try any murder cases." As a result, he was "saddled" with three murder

cases—including Simon's—that he tried in six weeks. JA 920, 921. He commented that "there is

no way that you could defend three murder cases effectively in any six-week period." JA 922.

When asked whether he was effective in defending Simon due to his case load, Ayala responded:

> I would have to characterize that as ineffective, because there is no way. Capital
> cases require a lot of leg work. Public Defender's Offices are not equipped with
> the personnel, and I mean the supporting personnel. For example, I had to do the
> investigations myself. I didn't have any competent investigator at that time for the
> investigator to go out there and track down nicknames.[25]

---

[24] The hearing was held pursuant to a habeas petition filed by Simon in January 2002 in District Court under 28 U.S.C. § 2254, Civ. No. 2002-012, which contained a claim for ineffective assistance of trial counsel. On June 28, 2006, the District Court dismissed this habeas petition without prejudice for failure to exhaust state remedies, with no finding on the merits of Simon's ineffective assistance claim. JA 1022-25. The Court further notes that then Superior Court Judge Ishmael Meyers, adjudicating yet another habeas petition alleging ineffective assistance of counsel, filed by Simon under 28 U.S.C. § 2254, Civ. No. 7/1995, denied the petition on August 19, 1998. Judge Meyers' Memorandum Opinion is contained in the record on appeal. JA 832-37.

[25] Ayala's reference to the tracking down of nicknames pertained to the development of an alibi defense. One week before the trial, Simon gave Ayala two nicknames but no addresses or telephone numbers. JA 924. While Ayala claims that he did not have "any competent

JA 923. Ayala was also asked about his trial strategy regarding the charges against Simon. He responded: "Actually, I had no strategy with Mr. Simon." JA 926.

Contrary to Simon's contention, under *Strickland* it is not an attorney's subjective opinion that governs whether his representation was or was not effective.[26] *Strickland* requires courts to assess whether the representation "fell below an *objective* standard of reasonableness" as determined by "prevailing professional norms." *Strickland*, 466 U.S. at 688 (emphasis added). Ayala's statements, upon which Simon relies, do not support such a conclusion.

Ayala's subjective assessment of his ineffectiveness focused in large part on attorney staffing problems, insufficient support personnel, and his heavy workload of three murder trials over a six-week period at the Territorial Public Defender's Office. However, these institutional problems—albeit daunting—do not, without more, establish that Ayala's representation of Simon was ineffective and fell below an objective standard of reasonableness.

Ayala's testimony, upon which Simon relies, does not reveal any facts that would specifically, and objectively, show that Ayala's representation was ineffective. While Ayala testified summarily that he had "no strategy with Mr. Simon," JA 926, he provided details at other times during the May 2003 hearing about the trial strategies that he attempted to implement, but was stymied by Simon, and the trial strategy that he ultimately adopted. Ayala testified that every time he sat down with Simon and attempted to formulate a defense—whether

---

investigator at that time" to track down the nicknames, the record shows that Ayala had investigators working with him on Simon's case. *See, e.g.*, JA 107, 942.

[26] Simon argues: "The testimony of Ayala could not be clearer; he himself admitted to Judge Finch that he was ineffective, which satisfies the first prong of the *Strickland* test." Appellant's Brief at 41. This is an incorrect statement of the law.

self-defense or an alibi defense—Simon would not answer him or would simply say he did not

do the shooting. *Id.* Ayala recounted that:

> Mr. Simon provided me with his theory of defense [that] would have been an alibi
> defense. I kept insisting with Mr. Simon that he had to provide me with the names
> and addresses [of the alibi witnesses], since I had to take those names to the
> government and allow the government time to investigate . . . those individuals.

JA 923-24. Ayala told Simon on another occasion that if he was not at the scene of the crime, he

needed to establish an alibi defense, but Simon "never stated to me, even at trial, after the

government closed its case" the details necessary to establish the defense.[27] JA 931; *see also* JA

930, 937. Ayala further added that Simon gave him the name of one witness "a week before

trial" that he was able to track down, but that individual stated he would not come to court to

testify on Simon's behalf. JA 923. Simon gave him at least two other nicknames but "no

addresses, no telephone numbers, no nothing. It's just like, for example, giving me Harry. Well,

who is Harry? I have to know which Harry. Harry that hangs out by the Tamarind Tree; Harry

that hangs out by Simmonds Alley. No nothing." JA 924. Ayala also discussed a self-defense

trial strategy with Simon, to no avail. JA 940-41. Under the circumstances, Ayala stated that the

"best strategy" was to "let it l[i]e," that is, to leave the Government to its proof—which was the

trial strategy he ended up employing on Simon's behalf. JA 936.[28]

    This testimony indicates not only that Ayala's conclusory statement that he had no

strategy does not tell the full story, but that his attempt to establish any alternative strategy from

---

[27] Ayala testified that Simon told him he went to St. John to gamble—which would have been "a
perfect alibi for him in St. John"—but Simon never gave him the names of the people he was
gambling with, or the place he went to gamble. JA 938.

[28] Ayala noted: "the only witness that I was left with in court, in actual court to enable [sic] to
sustain any defense was Mr. Simon himself," JA 933, and Simon chose not to take the stand. JA
932.

the "let it l[i]e" strategy that he ultimately adopted was frustrated by Simon. The fact that he was

consigned by default to a strategy wherein the Government was left to prove its case was a

strategy in and of itself. *See Strickland*, 466 U.S. at 691 ("The reasonableness of counsel's

actions may be determined or substantially influenced by the defendant's own statements or

actions.").

In view of the foregoing, Simon's contention that Ayala provided ineffective assistance

because Ayala characterized his assistance as ineffective and because he stated he did not follow

a trial strategy has no merit.

b. Failure to Seek a Continuance

Second, Simon asserts that Ayala provided him with ineffective assistance by failing to

seek a continuance when the Government moved to amend the Information. Simon maintains

that "any competent criminal defense attorney would have recognized the need to rebut the

prosecution's case, and the manner in which the defense was mounted had to have changed when

felony murder and robbery were added as counts." Appellant's Brief at 42. Simon argues that he

was prejudiced as a result, because he was not given a reasonable amount of time to mount a

cogent and effective defense. *Id.*[29]

The Court has previously addressed and rejected Simon's argument that the amendment

of the Information violated his Sixth Amendment rights. To the extent that his ineffective

assistance argument for failing to seek a continuance is based on that same premise or the same

underlying arguments, it is meritless. Where the underlying issue has no merit, an ineffective

---

[29] During the January 10, 1995 pretrial conference, at which the amendment of the Information
was first discussed, Simon informed the judge that he was ready to go to trial. *See* JA 118 ("I just
letting you know for the record, I don't want any continuance. I ready to go to trial.").

assistance claim cannot lie. *Lafler v. Cooper*, 132 S. Ct. 1376, 1386 (2012) (because matter upon

which the ineffective assistance claim was premised was meritless, defendant could not

demonstrate an error entitling him to relief); *Ross v. Dist. Attorney of the Cnty. of Allegheny*, 672

F.3d 198, 211 n.9 (3d Cir. 2012) ("We have held . . . that 'counsel cannot be deemed ineffective

for failing to raise a meritless claim.'") (quoting *Werts v. Vaughn*, 228 F.3d 178, 202 (3d Cir.

2000)); *Thomas v. Horn*, 570 F.3d 105, 121 n.7 (3d Cir. 2009) (rejecting ineffective assistance

claim where there was no merit to defendant's underlying claim of error).

In addition, Simon has not shown that Ayala's failure to seek a continuance was

objectively unreasonable, nor has he made any showing of "a substantial, not just conceivable"

likelihood that the outcome of the trial would have been different if counsel had asked for a

continuance. *Harrington v. Richter*, 562 U.S. 86, 112 (2011); *see also United States v.

Katopodis*, 2014 WL 4681435, at *5 (N.D. Ala. Sept. 16, 2014) ("Mere lack of preparation time

is not ineffective assistance of counsel.") (citing *United States v. Cronic*, 466 U.S. 648, 661

(1984)). Accordingly, we reject Simon's argument that counsel was constitutionally ineffective

for failing to seek a continuance.

    c. Counsel's Alleged Lack of Preparation

Simon next claims that "Ayala's lack of preparation was apparent" because: (1) it was not

until the end of the first day of trial that he requested that Police Officer David Jeffers be

compelled to testify; and (2) on the second day of trial, when Officer Mollah did not appear,

Ayala did not seek a continuance nor a writ of attachment for him. Appellant's Brief at 42.

According to Simon, these two officers transported Simon to a "show up" on the night of the

incident to determine whether Connor could identify Simon as being involved in the crime.

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 38

Simon alleges that Connor's response was that Simon was not involved. Because Ayala allegedly never contacted those police officers, Simon claims that Ayala rendered ineffective assistance. *Id.*

When asked at the May 2003 hearing whether he requested that the trial judge order the Marshals to find Officer Mollah, Ayala responded that he did not think it was "relevant at that point" because he was trying to establish an alibi defense, and "all the [officers] would have indicated was that Mr. [Connor] could not identify Mr. Simon as being there." JA 929. Pressed as to whether it would have been exculpatory if Connor had not simply said he could not identify him, but rather that Simon was not the person involved, Ayala answered "[t]hat would have been a matter of strategy, which was discussed with the defendant." JA 929.

Generally, "the determination whether to call a witness lies soundly with trial counsel, not the defendant." *United States v. Cleve-Allan George*, 2011 WL 5110409, at *6 (D.V.I. Oct. 26, 2011) (citing *Gov't of the V.I. v. Weatherwax*, 77 F.3d 1425, 1434 (3d Cir. 1996)). Under *Strickland*, a court presumes that, under the circumstances, a challenged action might be sound trial strategy. *Thomas v. Varner*, 428 F.3d 491, 499 (3d Cir. 2005). For a defendant to overcome that presumption, the defendant must show either that "(1) the suggested strategy (even if sound) was not in fact motivating counsel or, (2) that the actions could never be considered part of a sound strategy." *Id.* "Surmounting *Strickland*'s high bar is never an easy task." *Padilla*, 559 U.S. at 371; *see also Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.").

Ayala's testimony reveals that the decision not to call the officers was a matter of trial strategy. In the face of this evidence, Simon has not made either of the showings necessary to

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 39

overcome the "high bar" created by *Strickland*'s presumption that the challenged action was

sound trial strategy. Simon's argument is, therefore, without merit.

  d. <u>Failure to Object to Roach's Testimony</u>

  Next, Simon argues that Ayala provided ineffective assistance because he failed to object

to Roach's testimony that Simon, or an agent of Simon, had threatened Roach's life. Appellant's

Brief at 42. Simon asserts that Roach's remarks were "highly prejudicial"[30] and irrelevant to the

charge of felony murder; counsel rendered ineffective assistance by failing to object; and but for

the failure to object, Simon would have been found not guilty or would have been granted

another trial. *Id.* at 42-43. Simon's argument in this regard does not "demonstrate that these

statements were 'so serious as to deprive the defendant of a fair trial' or that, but for the failure to

object, the result of the proceeding would have been different." *Hanson v. Dragovich*, 426 F.

App'x 50, 60 (3d Cir. 2011) (quoting *Strickland,* 466 U.S. at 687).

  Early in his cross-examination of Roach, Ayala attempted to undermine Roach's

statement that he felt threatened by Simon or his brother (who was in the same jail as Roach).

Ayala's questions to Roach came in the context of Roach attempting to explain his statement that

he had lied under oath at his trial because he was afraid of Simon. *See* JA 340, 343, 344. Ayala

also highlighted the fact that Roach admitted that he had lied to a Deputy Marshal in Montserrat,

where he had fled following the crime, by stating that he did not know Simon. Roach again

attempted to explain his lie by stating that he was "scared" of Simon, although he admitted that

he did not know where Simon was and that he did not think that Simon could "get to him" while

---

[30] Simon claims that these statements were "highly prejudicial" because "the natural conclusion
that the jury would have made is that if Simon is willing to threaten and/or take the life of Roach,
Simon must have had the capacity to kill Ezekiel." Appellant's Brief at 43.

he was in Montserrat. JA 344-46. In addition, Ayala elicited testimony from Roach that although

Roach claimed to have been threatened if he testified, he had not been physically assaulted while

he was in jail. JA 383-84. Through his questioning of Roach, Ayala thus attempted to

demonstrate that the alleged fear that Roach claimed to have experienced and that he cited as the

reason for his lies was not credible. JA 344-47. In his closing, Ayala further challenged the

veracity of Roach's fear of Simon. JA 660-62.

In his examination of Roach and his closing argument, Ayala sought to undermine the

effect of Roach's statement that he was afraid of Simon. Thus, the failure to object to Roach's

statement appears to have been a matter of trial strategy where Ayala chose to question the basis

for the statement, buttress Simon's contention that Roach was a liar, and convince the jury that

Roach had concocted this alleged fear to justify his lies. In these circumstances, "there is a strong

presumption that trial counsel acted tactically, rather than neglectfully." *Dwyer v. Shannon*, 2008

WL 4082293, at *5 (E.D. Pa. Aug. 22, 2008) (citing *Yarborough v. Gentry*, 540 U.S. 1, 8

(2003)).

The Court finds that this ground of ineffective assistance of counsel is without merit.

e. <u>Failure to Object to Prosecutor's Closing Arguments</u>

Relatedly, Simon contends that Ayala provided ineffective assistance because he failed to

object to the prosecutor's closing argument that reiterated Roach's testimony that Simon or his

agent had threatened Roach's life. Appellant's Brief at 42. Simon claims that the prosecutor's

repetition of Roach's testimony and his argument in connection therewith in closing constituted prosecutorial misconduct which violated his due process rights.[31]

The Court finds this argument without merit. The prosecutor did not "manipulate or misstate the evidence" during his closing, *Darden v. Wainwright*, 477 U.S. 168, 182 (1986), as his statements were based on Roach's testimony that he was "scared for [his] life" because "Simon say he going to kill me" and that Simon shot Ezekiel. JA 325-26, 336-37. Thus, Simon's argument that the prosecutor's statements constituted prosecutorial misconduct and violated Simon's due process rights is unavailing.

Further, under U.S. Supreme Court precedent, where a prosecutor's closing remarks are challenged on habeas review, "[i]t is not enough that the prosecutor['s] remarks were undesirable or even universally condemned. The relevant question is whether the prosecutor['s] comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden,* 477 U.S. at 181 (internal quotation marks and citations omitted). "Supreme Court precedent counsels that the reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct . . . and the quantum of evidence against the defendant." *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001) (internal quotation marks omitted).

Given the evidence elicited at trial, it cannot be said that the statements regarding Roach's testimony and the prosecutor's closing argument infected the trial with such unfairness as to "make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181. Indeed,

---

[31] During his closing, the prosecutor commented that while it was true that Roach gave false testimony in his trial, Roach explained the reasons why—"because he was fearful. He was fearful as to what Carl Simon would do to him. He had seen Carl Simon kill before. He knew what Carl Simon could do." JA 646.

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 42

even if one were to assume that it was objectively unreasonable for Ayala not to object to

Roach's testimony and the prosecutor's related statements in the closing argument, Simon has

not demonstrated that but for the jury hearing these statements, the outcome of the trial would

have been different. To the contrary, Roach placed Simon with him at the scene of the crime as

the main participant—the shooter—and testified in detail about what occurred that evening. In

addition, Joseph Allen, a resident of St. John, testified that he knew Carl Simon, and that on the

evening of the crime, he saw Simon and Roach walking together toward Cruz Bay. JA 551-52.

Allen further remarked that Simon was acting nervously while on the dock and on the boat; that

Simon was hiding behind Allen; and that Simon continued to act nervously after they arrived on

St. Thomas. JA 553-60. Thus, the "quantum of evidence against the defendant"—both direct and

circumstantial—was sufficient to support a finding of guilt on the charges. *Moore*, 255 F.3d at

107.

      The Court therefore finds that this ground of ineffective assistance of counsel is without

merit.

      f. <u>Trial on Counts on which Simon Was Not Arraigned</u>

      Simon asserts that Ayala provided ineffective assistance by submitting him to a trial on

counts in the Information on which he was never arraigned—which Simon claims was

objectively unreasonable and caused him prejudice. Appellant's Brief at 44. This Court has

already found that the underlying claim of error on the issue of lack of an arraignment has no

merit. Consequently, there can be no meritorious ineffective assistance claim. *See Lafler,* 132 S.

Ct. at 1386; *Ross,* 672 F.3d at 211; *Thomas, 570* F.3d at 121 n.7. Thus, the Court rejects Simon's

ineffective assistance argument that is premised on the lack of an arraignment.

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 43

g. Conflict of Interest

Simon maintains that Ayala also provided ineffective assistance because he was laboring under an irreconcilable conflict of interest. This argument is based on Ayala's testimony at the May 2003 hearing that he "tried to get" Darrell Ward to testify on behalf of Simon because he believed Ward was one of the individuals who participated in the crime. JA 941. Notwithstanding that Bureau of Corrections records indicated that Ward was incarcerated on the night of the crime, Ayala knew that Ward was out of prison because Ward was "also one of my clients." *Id.* Ayala sent out one of his investigators to serve Ward "in the bushes." Ayala stated he could not force Ward to testify, and Ward did not testify at Simon's trial. JA 942.

Simon contends that Ayala "never called Ward as a witness and never moved to withdraw on this clear conflict of interest." Appellant's Brief at 44. According to Simon, the conflict occurred because Ward was never called as a witness nor was Ward identified as "the actual perpetrator of the crime." *Id.* at 45. Simon argues that, as a result, Ayala's representation fell below an objective standard of reasonableness. Simon maintains that:

> but for Ayala's deficient performance, the outcome would have been different because Ward could have exonerated Simon, or if Ward denied being at the scene of the crime or asserted his 5th Amendment right against self incrimination, Simon could have reasonably argued that it was Ward, not Simon, that was [at the crime scene].

*Id.*

"[T]he Sixth Amendment . . . ensures that every defendant will receive conflict-free representation." *United States v. Pryor*, 275 F. App'x 99, 102 (3d Cir. 2008). "In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected [the defense] lawyer's

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 44

performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). When explaining what constituted

an "actual conflict of interest," the Court in *Cuyler* cited *Glasser v. United States*, 315 U.S. 60,

72-75 (1942), where counsel, who was representing two defendants, failed to cross-examine a

prosecution witness and failed to object to inadmissible evidence. Both omissions "resulted from

counsel's desire to diminish the jury's perception of a codefendant's guilt." *Cuyler*, 446 U.S. at

349. Based on this actual conflict, the Court reversed the conviction. The Court in *Cuyler* went

on to say that a defendant who shows an actual conflict need not demonstrate prejudice; but

"until a defendant shows that his counsel actively represented conflicting interests, he has not

established the constitutional predicate for his claim of ineffective assistance." *Id.* at 349, 350.

Typical conflict of interest cases "giving rise to claims of ineffective assistance of

counsel involve multiple representation of clients—the conflict exists between the interests of

one defendant and the interests of other defendants served by the same attorney[.]" *Gov't of the*

*V.I. v. Zepp*, 748 F.2d 125, 135 (3d Cir. 1984). However "multiple representation or merely the

possibility of conflicting interest does not constitute a constitutional violation. The conflict of

interest must be actual" which is evidenced "if, during the course of the representation, the

defendants' interests diverge with respect to a material factual or legal issue or to a course of

action." *Id.* at 135-36 (quoting *Sullivan v. Cuyler*, 723 F.2d 1077, 1086 (3d Cir. 1983)); *see also*

*Mickens v. Taylor*, 535 U.S. 162, 171 (2002) (describing an actual conflict of interest as "a

conflict that affected counsel's performance—as opposed to a mere theoretical division of

loyalties.").

Simon's ineffective assistance of counsel argument based on an alleged conflict of

interest must fail. Especially problematic is the fact that his argument is grounded in speculation

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 45

and thus fails to rise to the level of an actual conflict. Simon claims that Ward's testimony could have exonerated him, or that Ward's alleged presence as a witness would have allowed him to argue that Ward, not Simon, was at the crime scene. However, there is no competent evidence that Ward was, in fact, the third person who participated in the crime. In fact, Roach testified that Ward was *not* the third person involved. JA 357-58, 361. The entire premise that Ward was involved is based on Ayala's *belief*—wholly unsupported by any factual basis in the record.

Thus, Simon has made no showing that, on this record, Ayala "actively represented conflicting interests," *Cuyler*, 446 U.S. at 350, or that Simon's and Ward's interests "diverge[d] with respect to a material factual or legal issue or to a course of action." *Zepp*, 748 F.2d at 136 (internal quotation marks omitted). What Ward might have testified to is pure conjecture borne out of Ayala's mere belief. Such speculation is insufficient to create an actual conflict of interest. *See Cuyler*, 446 U.S. at 350.[32]

In addition, Simon has failed to establish prejudice. His theory of prejudice is based on his belief that Ward could have exonerated him, and because Ward did not testify, he was found guilty. But as the Court has already found, there are no facts in the record that even place Ward at the scene of the crime. Roach's denial that Ward was present is countered only by Ayala's speculation. However, speculation does not establish prejudice. *See Strickland*, 466 U.S. at 693 (instructing that a habeas petitioner must "affirmatively prove prejudice"); *see also United States v. Tilley*, 2011 WL 673914, at *2 (W.D. Pa. Feb. 17, 2011) ("Speculation and conjecture are insufficient to establish prejudice.").

---

[32] Ayala's testimony that he took affirmative steps to call Ward as a witness on Simon's behalf does not suggest that Ayala was laboring under an actual conflict of interest in terms of his "loyalties" to his client Simon.

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 46

In view of the foregoing, the Court finds that Simon's claim of ineffective assistance due to an alleged conflict of interest is without merit.

h. Failure to Raise Subject Matter Jurisdiction

Simon claims that Ayala's failure to raise the issue that the Superior Court lacked subject matter jurisdiction to adjudicate his case "fell below the objective standard of reasonableness in the profession, and Simon was prejudiced because he was convicted by a court that lacked jurisdiction to enter a judgment and conviction." Appellant's Brief at 45. As discussed above, this Court has concluded that the Superior Court properly exercised jurisdiction over Simon's case. It is not ineffective assistance of counsel to raise an issue that has no merit. *See Lafler,* 132 S. Ct. at 1386; *Ross,* 672 F.3d at 211; *Thomas, 570* F.3d at 121 n.7. Thus, this ground of Simon's petition, must fail.

i. Constructive Denial of Counsel

Simon further argues that he was "constructively denied counsel" because of the "untenable position that the [Superior] Court placed Ayala in" due to the "11th hour amendment" of the Information. Appellant's Brief at 46. Simon further asserts that "given [counsel's] caseload, lack of support from the Territorial Public Defender's Office, and lack of time," Ayala "could not devote sufficient resources to Simon's case." *Id.*

By challenging the Superior Court's actions in allowing the amendment of the Information and thereby allegedly placing Ayala in an "untenable position" where he could not render effective assistance, Simon simply restates the amended information argument and an earlier iteration of his ineffective assistance argument, which this Court has already rejected. The

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 47

argument is no more persuasive when recast as ineffective assistance of counsel. *See Lafler,* 132

S. Ct. at 1386; *Ross,* 672 F.3d at 211; *Thomas,* 570 F.3d at 121 n.7.

With regard to Ayala's heavy caseload, courts have held that a habeas petitioner is "not

entitled to relief on his claim that there is a presumption of ineffective assistance of counsel

under [*United States v.*] *Cronic* [446 U.S. 648 (1984)] based on [the defense attorney's] heavy

caseload." *Whatley v. Upton*, 2013 WL 1431649, at *43 (N.D. Ga. Apr. 9, 2013); *see also United*

*States v. Katopodis*, 2014 WL 4681435, at *6 (N.D. Ala. Sept. 16, 2014) ("A mere conclusory

assertion that an attorney has a heavy caseload, without specification of any particular error, does

not support a claim of ineffective assistance of counsel.") (internal quotation marks omitted).

Once again, Simon does not provide any factual detail from the record that would demonstrate

how Ayala's representation was specifically impacted by his caseload, rendering it objectively

deficient. Thus, Simon's claim of ineffective assistance of counsel, based on the heavy caseload

and other institutional issues that his counsel faced, fares no better here.

j. <u>Breakdown of Attorney-Client Relationship</u>

Simon also contends that, under certain circumstances, including a "complete breakdown

in communication," substitution of counsel is warranted. Appellant's Brief at 47. He cites

Ayala's statement at the January 13, 1995 hearing that Simon was openly hostile to him, and his

own statement at the hearing that Ayala had not visited him. *Id.* Simon also cites the numerous

motions Ayala made to be relieved as counsel. *Id.* at 48. Simon concludes that both he and Ayala

had placed sufficient evidence on the record such that the Superior Court should have concluded

that the breakdown in communication constructively denied Simon's Sixth Amendment right to

counsel. *Id.*

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 48

Simon cites case law pertaining to substitution of counsel, which holds that if a defendant makes a motion to substitute counsel, and if he can show "good cause" for his claim for relief, the trial court must grant a continuance and appoint new counsel. *United States v. Goldberg*, 67 F.3d 1092, 1097-98 (3d Cir. 1995). Good cause is defined as showing "a conflict of interest, a complete breakdown in communication, or an irreconcilable conflict with the attorney." *Id.* at 1098 (citing *United States v. Welty*, 674 F.2d 185, 188 (3d Cir. 1982)). Here, Simon refers to three instances which he characterizes as Ayala "mov[ing] to be relieved as counsel." Appellant's Brief at 48.[33]

The Third Circuit has differentiated between the case law concerning *an attorney's motion to withdraw* and *a defendant's motion for substitution*, noting that the latter does not "neatly apply" to the former. *United States v. Gillette*, 738 F.3d 63, 78 (3d Cir. 2013). Although Ayala moved to withdraw, Simon never moved to substitute, and therefore the analysis required by *Welty* and *Goldberg* does not apply. Even so, analyzing this issue under *Strickland*, the Court does not find that there was a "complete breakdown in communication" that caused counsel's representation of Simon to fall below an objective standard of reasonableness, or that resulted in prejudice to Simon.

---

[33] The first instance is at the January 10, 1995 hearing where Ayala informed the court of the difficulty he had in representing Simon, and suggested that "perhaps it would be in Mr. Simon's best interest to have somebody else represent him." JA 81. In response, Simon asserted, "I don't want a next Attorney." JA 81-82. The Judge responded, "Sir [to Simon], keep quiet. I'm not going to relieve you, Mr. Ayala." JA 82. The second instance was during the January 13, 1995 hearing when Ayala asked: "Can I be relieved?" In the course of the colloquy, the Judge responded, "No, Sir," and continued with the hearing. JA 110. The third instance occurred on the first day of trial when the judge was addressing various motions. Ayala stated, "Motion to Withdraw" and the Court responded, "That was denied." JA 155. Simon does not otherwise explain the basis of that motion or cite to it in the record. Ayala testified that he asked the Court to be relieved from representing Simon "because I could not get anything out of Mr. Simon in terms of defending him." JA 932.

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 49

While Simon argues that his statement criticizing counsel for not visiting him equates to a "complete breakdown in communication," he acknowledged at the January 10, 1995 pretrial conference that Ayala had visited him three times in the eight-month period prior to trial. JA 90. Moreover, during the May 2003 hearing, Ayala testified that he "practically lived with Mr. Simon at the jail. It had to be [a visit] at least once every month, because he would call me, and I would go over there. . . I would say at least ten times, because we had to discuss strategy concerning the case." JA 918. Simon, on the other hand, testified at that hearing that he and Ayala had one meeting that lasted 15-20 minutes, "maybe a half-hour at the longest." JA 948.

Whether Ayala made one or three pre-trial visits to Simon, as Simon variously stated, or whether Ayala "practically lived with Simon," as Ayala contends, the facts show that there was pretrial communication between the two. *See, e.g.*, *United States v. Berroa*, 374 F. App'x 266, 270 (3d Cir. 2010) (finding that because attorney and defendant had discussed legal strategy before the pretrial conference, that did not indicate a complete breakdown in communication). Simon's dissatisfaction with the number of times that Ayala visited him simply does not equate to a "complete breakdown of communication."

In addition, while there was clearly friction in the relationship—as Ayala described Simon as "hostile" to him—that also does not equate to a "complete breakdown of communication." In the same sentence that Ayala stated that "Mr. Simon is a hostile client to me," he went on to say "I cannot, under any circumstances, waive any of his rights that he may have. I would protect whatever rights Mr. Simon has to the fullest." JA 104. Thus, notwithstanding what Ayala described as Simon's hostility, Ayala continued to advocate for his client's best interests and protect his rights.

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 50

Moreover, after Simon suggested that he could represent himself, the judge informed him that he would have to follow the rules of evidence and criminal procedure. JA 115-16. Simon then demurred, stating that he did not wish to represent himself but to assist Mr. Ayala. The judge instructed that either he would have to move to represent himself, and put his reasons in writing, or Ayala would represent him. JA 116-18. Simon never made such a motion.

Based on these facts, Simon has not demonstrated that a complete breakdown of communication existed, much less that such an alleged breakdown caused Ayala's representation of him to fall below an objective standard of reasonableness. Nor has he demonstrated that he was prejudiced by Ayala's continued representation of him in the face of their challenging relationship. Accordingly, the Court rejects Simon's claim of ineffective assistance of counsel based on an alleged breakdown of the attorney-client relationship.

k. "Meaningful Adversarial Testing" of Prosecution Case

Simon contends that Ayala "did not subject the prosecution's case to meaningful adversarial testing" as he did not give an opening statement or call any witnesses and therefore Simon was "denied the assistance of an effective attorney." Appellant's Brief at 46-47 (citing *Cronic*, 466 U.S. at 657).

"The right to the effective assistance of counsel is . . . the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." *Cronic*, 466 U.S. at 656. "[I]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Id.* at 659. The "meaningful adversarial testing" to which *Cronic* was referring concerns "a confrontation between adversaries." *Id.* at 657. "'The very

premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free.'" *Id.* at 655 (quoting *Herring v. New York*, 422 U.S. 853, 862 (1975)). As an example of the lack of meaningful adversarial testing—where no specific showing of prejudice is required—*Cronic* cited *Davis v. Alaska*, 415 U.S. 308 (1974), where the petitioner had been "'denied the right of effective cross-examination' which 'would be constitutional error of the first magnitude and no amount or showing of want of prejudice would cure it.'" *Id.* at 659 (quoting *Davis*, 415 U.S. at 318). The Court noted that, "[a]part from circumstances of that magnitude, however, there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." *Id.* at 659 n.26 (citing cases).

Here, too, Simon has not met his burden of explaining how counsel's failure to provide an opening statement rose to the level of a lack of meaningful adversarial testing of the prosecution's case so as to constitute ineffective assistance of counsel. That failure certainly does not meet the high bar set forth in *Cronic* for a "constitutional error of the first magnitude" for which no showing of prejudice arising from specific errors of counsel would be necessary. Simply stated,  the fact that no opening statement was given, without more, does not equate to ineffective assistance. *See Dwyer*, 2008 WL 4082293, at *6 ("[T]he lack of an opening statement does not automatically imply that Petitioner has been deprived of a fair, reliable trial. There is no unfettered constitutional right to an opening statement."); *see also Smith v. Adams,* 506 F. App'x 561, 565 (9th Cir. 2013) (counsel's decision not to give an opening statement at murder trial involved a matter of trial tactics and therefore did not constitute deficient performance);

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 52

*Millender v. Adams*, 376 F.3d 520, 525 (6th Cir. 2004) ("An attorney's decision not to make an

opening statement is ordinarily a mere matter of trial tactics and . . . will not constitute . . . a

claim of ineffective assistance of counsel.") (internal quotation marks omitted); *Clayton v.*

*Gibson*, 199 F.3d 1162, 1178 (10th Cir. 1999) (failing to give any opening statement at all is not

automatic proof of ineffective assistance). Nor has Simon demonstrated how the absence of an

opening statement constituted an error by counsel that "undermined the reliability of the finding

of guilt." *See Cronic*, 466 U.S. at 659 n.26.

Indeed, far from constituting ineffective assistance of counsel, the absence of an opening

statement by Ayala might be amply justified by the realities of the situation with which he was

faced. During the May 2003 hearing, Ayala testified to difficulties he experienced in formulating

an alibi defense or self-defense theory of the case as a result of Simon's lack of cooperation in

providing him with the necessary information to support such defenses. When the trial began,

Ayala was still uncertain as to whether he could mount an alibi defense, in particular, and

whether Simon would testify in that regard. *See* JA 919, 912, 926-27, 929, 930-33, 936-41.

Given that the purpose of an opening statement is to "summarize the facts that the evidence will

show, state the issues, make it easier for the jurors to understand what is to follow, and relate

parts of the evidence and testimony to the whole," 33 Fed. Proc., L. Ed. 77:248, the fact that

Ayala did not know which defense to outline in his opening statement to the jury could certainly

influence the decision as to whether to give such a statement.[34] *See Strickland*, 466 U.S. at 691

("The reasonableness of counsel's actions may be determined or substantially influenced by

---

[34] When the Judge inquired whether he would give an opening statement, Ayala responded that
he "consulted with Mr. Simon. We will reserve our right to make an opening statement when our
time comes." JA 298. He never gave one.

defendant's own statements or actions. Counsel's actions are usually based, quite properly, on

informed strategic choices made by the defendant and on information supplied by the

defendant."). Accordingly, the Court finds no merit to Simon's ineffective assistance claim on

this ground.

Similarly, Simon has not met his burden of showing how not calling witnesses on his

behalf constituted ineffective assistance. As described above, Ayala testified that he did not call

two police officers as a matter of trial strategy, given the alibi defense he was trying to establish

at the time. JA 928-29. *See Strickland*, 466 U.S. at 690-91 (opining that decision whether to

interview and call particular witnesses is generally a strategic choice made by counsel and is

entitled to a "heavy measure of deference").

Ayala also explained that when he was trying to elicit names of other witnesses to testify

on Simon's behalf to establish an alibi defense, Simon provided him with only nicknames a week

before the trial. Ayala successfully tracked down one of them, but he refused to testify. JA 923.

Without cooperation from Simon in this regard, Ayala was hamstrung in establishing a defense

and was relegated to a strategy of having the Government prove its case. *See Strickland*, 466

U.S. at 691 (opining that reasonableness of counsel's actions may be determined by defendant's

actions); *Rolan v. Vaughn,* 445 F.3d 671, 681-82 (3d Cir. 2006) ("*Strickland* and its progeny

make clear that counsel's strategic choices will not be second-guessed by *post-hoc*

determinations that a different trial strategy would have fared better."). Thus, even when couched

in *Cronic*'s "meaningful adversarial testing" rubric, Simon's ineffective assistance of counsel

argument on this ground also fails.

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 54

l. Failure to Object to Closure of the Courtroom

Simon asserts that Ayala provided ineffective assistance of counsel by not objecting to the closure of the courtroom doors during closing arguments, which allegedly interfered with his right to a public trial. Appellant's Brief at 48-49. He states that because the "[p]ublic was not allowed in during the closing arguments, there can be only one conclusion: Simon is entitled to a new trial." *Id.* at 50. Simon's argument is grounded in the proposition that, because closure of the courtroom is a structural error, prejudice is presumed and his right to a new trial based on ineffective assistance of counsel is automatic. *Id.* Simon's argument fails.

Prior to the summations, the trial judge in Simon's case stated:

We are at the stage now where both sides have rested, and the attorneys will now summarize and argue the case to you, after which I will give you the Instructions of Law that you are to follow in this case.

Now, for the ladies and gentlemen of the audience, the doors will be locked during the arguments and during the instructions.

If anyone wishes to leave before the case ends, you may do so, but only when an attorney sits down and before the other Attorney gets up you will be permitted to leave.

JA 633-34. Neither the prosecution nor the defense objected to the judge's expressed plan of action, and proceedings continued accordingly.

The right to a public trial originates with the Sixth Amendment, which directs that "'[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . public trial.'" U.S. Const. amend. VI. "'The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." *Waller v. Georgia*, 467 U.S. 39, 46 (1984) (quoting *Gannett Co. v.*

*DePasquale*, 443 U.S. 368, 380 (1979)). "This guarantee 'has always been recognized as a safeguard against any attempt to employ our courts as instruments of persecution. The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power.'" *United States v. Lnu*, 575 F.3d 298, 305 (3d Cir. 2009) (quoting *Gannett Co.*, 443 U.S. at 380).

"In general, the denial of a defendant's right to a public trial is a 'structural error'—*i.e.*, a defect 'affecting the framework within which the trial proceeds'—requiring reversal irrespective of whether the defendant demonstrates the error prejudiced his substantial rights." *United States v. Greene*, 431 F. App'x 191, 195 (3d Cir. 2011) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)). "It does not necessarily follow, however, that every deprivation in a category considered to be 'structural' constitutes a violation of the Constitution[.]" *Gibbons v. Savage*, 555 F.3d 112, 120 (2d Cir. 2009). Thus, not every courtroom closure or denial of public access to court proceedings violates a defendant's right to a public trial or otherwise implicates a defendant's Sixth Amendment rights. *See United States v. Ivester*, 316 F.3d 955, 958-59 (9th Cir. 2003); *Peterson v. Williams*, 85 F.3d 39, 42-43 (2d Cir. 1996). Indeed, many circuits have recognized "that there are certain instances in which [an] exclusion cannot be characterized properly as implicating the constitutional guarantee." *Braun v. Powell,* 227 F.3d 908, 918 (7th Cir. 2000). That holds true in the Third Circuit. *See Lnu*, 575 F.3d at 307 (holding that government's failure to broadcast wiretap recordings over audio speaker in courtroom did not violate defendant's right to a public trial); *United States v. Patton*, 502 F. App'x 139, 142 (3d Cir. 2012) (no Sixth Amendment violation where members of defendants' families were denied entry into courtroom at commencement of jury selection because it was filled to capacity);

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 56

*Greene,* 431 F. App'x at 196-97 (temporary exclusion of defendant's brother from courtroom during voir dire did not violate defendant's right to public trial).

The question here is whether locking the courtroom doors during closing arguments and jury instructions in Simon's case constitutes a Sixth Amendment violation. We conclude that it does not.

Some circuit and district courts have held that where courtroom doors were locked during closing arguments and/or jury instructions, but where members of the public remained in the courtroom to observe the proceedings, this did not amount to a "closure" of the courtroom for Sixth Amendment purposes. *See Ivester*, 316 F.3d at 958 (before determining whether a court violated a defendant's right to a public trial, it must first determine whether the right attaches). For example, in *United States v. Scott*, 564 F.3d 34 (1st Cir. 2009), the trial judge informed the courtroom spectators that, during the "lengthy" jury charge, no one would be permitted to enter or leave the courtroom. *Id.* at 37. The First Circuit held that the courtroom was not closed to the public because the court "announced to the already-present spectators that they were welcome to stay in the courtroom but that they would not be permitted to leave during the charging of the jury, presumably to avoid distracting the jury during the 'lengthy' and complex charge." *Id.* Given its comments, the "court plainly had no intention of excluding the public," and no one was asked to leave. *Id.* at 37-38. The First Circuit added:

> [I]t is true that if a hypothetical member of the public had arrived after the jury charge had commenced, he or she would not have been able to gain access to the proceedings. However, the purpose of the public trial protection is to 'benefit. . . the accused; that the public may see he is fairly dealt with and not unjustly condemned. . . .' In the case before us, the public was indeed present at the jury charge and with its presence cast the sharp light of public scrutiny on the trial proceedings, thus providing the defendant with the protections anticipated by the public trial provisions of the Constitution. That a hypothetical member of the

> public who arrived late for the jury charge might have been barred from the proceedings does not undermine the public nature of the proceedings as they were actually conducted, though it may have implications for the hypothetical late-arriving person's individual right of access (a question we are not presented with in this case and decline to address).

*Id.* at 38 (internal citations omitted).

Similarly, in *Herring v. Meachum*, 11 F.3d 374 (2d Cir. 1993), the Second Circuit ruled that the trial court's decision to lock the doors during jury instruction "did not effect a 'closure' for Sixth Amendment purposes." *Id.* at 379. *Herring* cited an earlier case, *United States v. Romano*, 684 F.2d 1057 (2d Cir. 1982), which held that no closure had occurred because members of the public had access to the courtroom before the doors were locked and were present when the jury charge was delivered. *Id.* at 1065. The *Herring* Court rejected the defendant's argument that *Waller* had undermined the reasoning in *Romano*, opining that *Waller* was distinguishable because it involved a complete exclusion of the public from the proceedings. By contrast, in *Herring*, "spectators had unrestricted courtroom access throughout the trial, including the jury charge, as long as they arrived before it began." 11 F.3d at 380. The Second Circuit considered the locked courtroom doors in this instance an example of "reasonable time, place, and manner limitations on access to the courtroom" which was "permitted to ensure the fair and efficient administration of justice." *Id.*; *see also Vargas v. United States*, 819 F. Supp. 2d 366, 384-85 (S.D.N.Y. 2011) (locked courtroom doors during jury instructions, with entry to and exit from courtroom not permitted, constituted reasonable restriction on access which did not rise to the level of a Sixth Amendment closure).

In addition, in *Bell v. Evatt*, 72 F.3d 421 (4th Cir. 1993), the defendant argued that the trial judge prevented ingress and egress to the courtroom during witness testimony, which

violated his Sixth Amendment rights. The Fourth Circuit rejected that argument, holding that this

action constituted a "reasonable limitation[] on access to a trial in the interest of the fair

administration of justice," *id.* at 433 (citing *Press-Enterprise Co. v. Superior Court*, 464 U.S.

501, 510 n.10 (1984)), and pointing out that the Circuit has long held that a defendant's Sixth

Amendment rights were not implicated by "temporary limitation of ingress and egress to the

courtroom to prevent disturbance of the proceedings." *Id.* (citing *Snyder v. Coiner*, 510 F.2d 224

(4th Cir. 1975)). The court observed that the trial judge "was merely maintaining order in his

courtroom and ensuring a non-disruptive atmosphere for jury members, the litigants, the

members of the press, and any members of the public who chose to attend," and had "neither

ordered anyone to leave the courtroom nor closed any portion of the trial from the public

altogether." *Id.* Moreover, the record in *Bell* did not "reveal that anyone interested in the case

was excluded from the courtroom." *Id.* The court concluded that the defendant's right to an open

and public trial was not violated, as the judge was exercising his discretion "to preserve order in

his courtroom and ensure that justice was unobstructed." *Id.; see also United States v. Gilmore*,

1998 WL 721115 at *11 (N.D. Ill. Oct. 8, 1998) (locked doors during closing arguments did not

effect a closure for Sixth Amendment purposes).

In like manner, in an unpublished opinion in *United States v. Dugalic*, 489 F. App'x 10

(6th Cir. 2012), the Sixth Circuit affirmed the district court's ruling that the defendant was not

denied his Sixth Amendment right to a public trial when the judge announced that once the

closing arguments began, the courtroom doors would be locked in order to prevent the jury from

being distracted by people coming in and out. The Sixth Circuit held that "the public was not

denied access to the courtroom during closing arguments; it was merely prevented from entering

and leaving the courtroom while those arguments were going on." *Id.* at 19.  *Cf. United States v. Cannon*, 2011 WL 1103656, at *4 (E.D. Pa. Mar. 23, 2011) (where ingress and egress from courtroom not permitted during jury instructions, anyone who wished to remain could do so, and where there was no evidence that anyone was excluded during the charge, there were no grounds for objecting to this procedure).

The reasoning and holdings in these cases call into question whether there was even a "closure" under the circumstances here that would implicate the Sixth Amendment guarantee of a public trial. We read the trial judge's comments as inviting the spectators, who were already in the courtroom, to stay for closing arguments and jury instructions if they so desired. Despite the locking of the doors, the judge did not remove members of the public from the courtroom, nor did he forbid them to leave. Rather, he simply attempted to restrict their movement out of the courtroom to breaks when one attorney finished his closing and before the next one began to speak, in order to avoid jury distraction during these important parts of the proceeding. Further, although the judge mentioned only the opportunity for spectators to leave the courtroom but not to enter, it is reasonable to conclude that entry into the courtroom would have been governed by the same restriction on exiting that was imposed by the judge—that is, linked to a break in summations and when instructions were not ongoing. Notwithstanding the locked courtroom doors, the record does not indicate that anyone who wished to enter or leave the courtroom was prevented from doing so, and Simon does not so argue.[35] Moreover, Simon does not claim that there was anything but free and unrestricted access to the courtroom at all other times during the trial. Accordingly, we conclude—in accordance with the reasoning adopted by the courts in the

---

[35] As noted earlier, Simon's argument rests solely on the fact that the courtroom doors were locked during closing argument—nothing more.

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 60

cases described above—that the courtroom "closure" at issue in this case did not rise to the level

of a denial of public access, much less a Sixth Amendment violation.[36]

Even if the Court were to assume that a denial of public access occurred here, this would

not alter the Court's conclusion that there was no Sixth Amendment violation. As with *Scott,*

*Herring, Bell, Vargas,* and *Dugalic*—the circumstances in the instant matter are a far cry from

Supreme Court Sixth Amendment jurisprudence on this topic, which has addressed situations

where *all* members of the public were excluded during some phase of the trial. Such a closure of

the courtroom has been characterized as a "total" or "complete" courtroom closure.

In *Waller*, the trial court, on the government's motion, closed a seven-day suppression

hearing to the public. The Supreme Court held that the closure of the hearing "plainly was

unjustified," and set forth four factors that must be met for a complete closure to withstand Sixth

Amendment scrutiny: "[1] the party seeking to close the hearing must advance an overriding

interest that is likely to be prejudiced, [2] the closure must be no broader than necessary to

protect that interest, [3] the trial court must consider reasonable alternatives to closing the

proceeding, and [4] it must make findings adequate to support the closure." *Waller*, 467 U.S. at

48 (the "*Waller* factors").

Over two decades later, in *Presley v. Georgia*, 558 U.S. 209 (2010), the Supreme Court

extended the Sixth Amendment public trial protections to the voir dire process. In that case, the

---

[36] As discussed above, a number of factors present in this case have contributed to our conclusion that there was no denial of public access here. However, like the First Circuit in *Scott,* we "sound a note of caution," as "a procedure such as [locking the courtroom doors] should be employed only carefully and sparingly, in order to avoid even the appearance that our nation's courtrooms are closed or inaccessible to the public. We commend to the sound judgment of the [trial] court the responsibility, in the first instance, of ensuring both openness and order, and above all, preserving the defendant's constitutional right to a public trial." *Scott,* 564 F.3d at 39.

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 61

trial court, over objection, had excluded the public from the entire voir dire proceeding due to

space limitations. The Supreme Court opined that the trial court should have considered

"'reasonable alternatives to closing the proceeding,'" and held that the failure to do so violated

the defendant's Sixth Amendment rights. *Id.* at 214-15 (quoting *Waller*, 467 U.S. at 48). *See also*

*In re Oliver,* 333 U.S. 257, 270-72 (1948) (finding that accused's rights were violated by

conviction in a secret proceeding without the presence of any members of the public, who had

been barred from the trial chamber). In these cases, the Supreme Court has drawn a bright line: if

there is a complete closure of the courtroom, a showing under the four *Waller* factors must be

made to justify it.

Quite clearly, no such complete closure occurred here. Thus, even if we were to assume

that the circumstances here constitute a denial of public access, the Supreme Court cases would

not be germane.

Unlike in *Waller* or *Presley*, there are situations where some members of the public—but

not all—are excluded from the courtroom. In these circumstances, courts of appeals have

distinguished a complete or total closure of the courtroom—such as occurred in *Waller* and

*Presley*—from a partial closure where courtroom access is limited in some fashion. *See, e.g.,*

*United States v. Yazzie*, 743 F.3d 1278, 1288 n.4 (9th Cir. 2014) (observing that a partial closure

occurs "when specified individuals are excluded, rather than the public as a whole."); *United*

*States v. Addison*, 708 F.3d 1181, 1187 (10th Cir. 2013) (excluding only defendant's relatives

from courtroom during witness' testimony was partial closure); *Bucci v. United States,* 662 F.3d

18, 23 (1st Cir. 2011) (stating that in partial closure cases, courtroom access is restricted but

some members of the public are permitted to attend); *Judd v. Haley*, 250 F.3d 1308, 1315 (11th

Cir. 2001) (defining partial closure as comprising a "situation[] in which the public retains some

(though not complete) access to a particular proceeding.").

Because some members of the public remain in the courtroom during a partial closure,

courts have held that such closures have "a reduced impact on a defendant's rights," *Yazzie*, 743

F.3d at 1288  n.4, and that they do not "'implicate the same secrecy and fairness concerns that a

total closure does.'" *United States v. Farmer*, 32 F.3d 369, 371 (8th Cir. 1994) (quoting *Woods v.

Kuhlmann,* 977 F.2d 74, 76 (2d Cir. 1992)). As a result, many circuits have held that where a

"partial closure" occurs, "the first *Waller* factor is less rigorous. In such cases, there must only be

a 'substantial reason,' rather than an 'overriding interest' justifying the closure." *United States v.

Smith*, 426 F.3d 567, 571 (2d Cir. 2005). Using this less stringent standard, some courts have

analyzed partial closures by focusing on the "substantial reason" factor. *See, e.g., United States

v. Flanders*, 845 F. Supp. 2d 1298, 1302 (S.D. Fla. 2012), *aff'd* 752 F.3d 1317 (11th Cir. 2014),

*cert. denied*, 135 S. Ct. 1188 (2015); *see also United States v. Christie*, 717 F.3d 1156, 1168

(10th Cir. 2013) ("[T]o support a partial closure of a trial, the district court need only identify a

'substantial' interest rather than a 'compelling' one, and document it with 'sufficient findings to

allow the reviewing court to assess the decision.'") (quoting *United States v. Galloway*, 937 F.2d

542, 546 (10th Cir. 1991)); *United States v. Cervantes*, 706 F.3d 603, 612-13 (5th Cir. 2013)

(assessing partial closure by determining if trial court had substantial reason for partially closing

a proceeding); *United States v. Petters*, 663 F.3d 375, 383 (8th Cir. 2011) (assuming partial

closure and analyzing whether substantial reason was offered). Other courts apply the less

stringent substantial reason factor, together with the remaining *Waller* factors, to determine if a

partial closure was justified. *See, e.g., United States v. Villareal,* __ F. App'x __, 2015 WL 3943153, at *1-2 (9th Cir. June 29, 2015); *Smith,* 426 F.3d at 572-74.

If the restriction imposed by the judge here is deemed to constitute a denial of public access, it would be, at most, a partial closure because members of the public were permitted to remain in the courtroom.[37] Even under a partial closure analysis, however, the Court's conclusion that no Sixth Amendment violation occurred remains unchanged.

In discussing what might constitute a "substantial reason" for a partial closure, the judge in *Flanders* held that locking the courtroom doors for the duration of the closing arguments would "maintain order in the courtroom and prevent distraction to the parties and jurors." *Flanders*, 845 F. Supp. 2d at 1300.[38] Noting that courts could, "in the interest of justice . . . 'impose reasonable limitations on access to a trial,'" *id.* at 1302 (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 581 n.18 (1980)), the court concluded:

> Finally, there is no question that this Court was justified in limiting the ability of the public to disturb the jury and counsel at such an important part of the proceedings. Closing arguments are intended as a last opportunity for the parties to impress upon the jury a specific view of the evidence and to influence the jury to return with a favorable verdict. Allowing members of the public to freely come

---

[37] The Court notes, however, that the circumstances here do not fit squarely within the partial closure framework. For the most part, cases discussing partial closures contain evidence in the record of individuals actually being excluded from the courtroom. *See, e.g., United States v. Thompson*, 713 F.3d 388, 395 (8th Cir. 2013) (exclusion of defendant's family during one witness's testimony); *Cervantes*, 706 F.3d at 611-12 (exclusion of some, but not all, of defendants' family members during voir dire); *Bucci*, 662 F.3d at 24 (exclusion of members of public from voir dire, although two members of defendant's family were present). By contrast, in this case, as referenced in *Scott*, 564 F.3d at 38, we are left with only a hypothetical member of the public who may have been excluded when the doors were locked, but no record evidence that anyone was actually excluded.

[38] In *Flanders*, the courtroom doors were locked for the entirety of the closing arguments. *Flanders,* 845 F. Supp. 2d at 1300. Here, the judge permitted the doors to be unlocked in between the summations by counsel.

and go during the parties' closing arguments would have distracted members of the jury and inhibited their ability to perform their important function. 'It is far more important that trials be conducted in a quiet and orderly setting than it is to preserve that atmosphere on city streets.' *Richmond Newspapers, Inc.*, 448 U.S. at 581 n.18.

*Id.* at 1302-03. On appeal, the Eleventh Circuit affirmed the trial court's ruling that the defendants' Sixth Amendment right to a public trial was not violated. *Flanders*, 752 F.3d at 1337.

As noted earlier, based on the judge's comments in the instant matter, it is apparent that the reason for locking the courtroom doors was to avoid interruptions and distractions from people walking in and out of the courtroom during the summations and jury instructions—which has been found to be both a "substantial reason" under *Flanders* and a reasonable restriction on courtroom access in *Scott, Bell, Herring,* and *Vargas.* Further, even if we follow the approach of some courts in assessing the partial closure under the remaining *Waller* factors, we find that they were met here. The closure was limited in scope, as it lasted only during the closings and jury instructions. Moreover, the closure was not absolute: it simply restricted access to certain breaks in the presentation, and did not restrict attendance; therefore, it was "unlikely to jeopardize the aims served by the public trial guarantee." *Greene*, 431 F. App'x at 196. Additionally, it is difficult to conceive of reasonable alternatives to this mode of controlling activity in the courtroom so as not to disturb the jury's concentration during these important parts of the trial. Finally, while the judge did not make specific findings justifying the closure, the reasons are implicit in his comments. *Cf. United States v. Thompson*, 713 F.3d 388, 395 (8th Cir. 2013) (observing that "'specific findings by the district court are not necessary if we can glean

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 65

sufficient support for a partial temporary closure from the record.'") (quoting *Farmer*, 32 F.3d at

371). Accordingly, under a partial closure analysis, there was no Sixth Amendment violation.

Further support for our ruling here is found in the conclusion of a number of courts that

"the question of whether a particular closure implicates the Sixth Amendment turns on whether it

undermines the values the Amendment is aimed to protect." *Carson v. Fischer*, 421 F.3d 83, 92-

93 (2d Cir. 2005); *see also United States v. Perry*, 479 F.3d 885, 890 (D.C. Cir. 2007) ("A

courtroom closing is 'trivial' if it does not implicate the 'values served by the Sixth Amendment'

as set forth in *Waller*.") (quoting *Peterson*, 85 F.3d at 42 and citing *Waller*, 467 U.S. at 46-47).

Under this analysis,

> [a]n unjustified courtroom closure only infringes a defendant's Sixth Amendment
> rights if it undermines the values the Supreme Court identified in *Waller v.
> Georgia*, 467 U.S. 39 (1984) as fundamental to the public trial guarantee. If the
> closure did not jeopardize or subvert these values, which (1) ensure a fair trial; (2)
> remind the government and judge of their responsibility to the accused and
> importance of their functions; (3) encourage witnesses to come forward; and (4)
> discourage perjury, it did not offend the Sixth Amendment because the closure is
> considered trivial.

*Patton*, 502 F. App'x at 141-42 (citations omitted) (referring to the four "*Waller* values"); *see*

*Waller*, 467 U.S. at 46; *Greene*, 431 F. App'x at 195-97; *Scott v. Bartkowski,* 2013 WL 4537651,

at *21-22 (D.N.J. Aug. 27, 2013) (examining *Waller* values to determine whether a courtroom

closure violates a defendant's Sixth Amendment rights). In other words, not every courtroom

closure—even if unjustified—implicates a defendant's Sixth Amendment rights. *See Ivester*, 316

F.3d at 958. Here again, the results of a *Waller* values analysis are fatal to Simon's claim.

With regard to the first two *Waller* values, although the trial judge locked the courtroom

doors during the closing arguments and jury instructions, his comments from the bench indicate

that spectators—*i.e.*, members of the public—were free to remain in the courtroom. They were

not required to leave, and the closing arguments and jury instructions took place in their

presence. With members of the public present, they could see that Simon was "fairly dealt with

and not unjustly condemned," and could "keep his triers keenly alive to a sense of their

responsibility and to the importance of their functions." *Waller*, 467 U.S. at 46. Thus, under the

circumstances here, the conduct of the proceedings and the actions of the judge and prosecutor

were subject to "'contemporaneous review in the forum of public opinion.'" *Lnu*, 575 F.3d at

305 (quoting *Gannett Co.*, 443 U.S. at 380); *see id.* at 306 ("[T]he Sixth Amendment's

'requirement of a public trial is satisfied by the opportunity of members of the public and the

press to attend the trial and to report what they have observed.'") (quoting *Nixon v. Warner

Commc'ns. Inc.*, 435 U.S. 589, 610 (1978)).

The third and fourth *Waller* values—encouraging witnesses to come forward and

discouraging perjury—are not implicated here because the closure occurred after there were no

more witnesses to be called and both sides had rested. Thus, there was no opportunity at this

stage of the proceedings for a witness to come forward, or to be discouraged from committing

perjury. *See George v. LaValley*, 2015 WL 1120104, at *2 (E.D.N.Y. Mar. 12, 2015) (noting that

third and fourth *Waller* values inapplicable where temporary exclusion occurred at jury selection,

during which no one testified or had an opportunity to do so); *cf. Hoyt v. Lewin*, 444 F. Supp. 2d

258, 272 (E.D.N.Y. 2006) (finding that third *Waller* value not impacted by closure because "no

potential witnesses were excluded from the courtroom.").

In view of the foregoing, the Court finds that the closure—even if deemed to constitute

an "unjustified" denial of public access—did not undermine the values identified by the Supreme

Court as "fundamental to the public trial guarantee." *Patton*, 502 F. App'x at 141. Thus, under

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 67

the *Waller* values analysis, there was no violation of Simon's right to a public trial under the

Sixth Amendment.

In sum, the Court concludes that, regardless of the analysis, Simon's Sixth Amendment

right to a public trial was not violated. As a result, Ayala's failure to object to the closure of the

courtroom—an issue that has no merit—was not objectively unreasonable under *Strickland*, and

the Court rejects this ineffective assistance of counsel argument. *See Bucci*, 662 F.3d at 31

("[C]ompetent counsel could have knowingly and reasonably declined to raise the [courtroom

closure] constitutional issue in this case because doing so would be a waste of the defense's time,

energy and resources."); *Vargas,* 819 F. Supp.2d at 385 (no ineffective assistance of counsel

claim lies because "counsel was entitled to believe that an objection was pointless inasmuch as

the court made 'a reasonable judgment that the lengthy and complex nature of the jury charge . . .

justified requiring that members of the public not enter or exit the courtroom during the

instruction."') (quoting *Scott*, 564 F.3d at 38); *Cannon*, 2011 WL 1103656, at *4 (finding no

ineffective assistance where counsel failed to object to closure of courtroom during jury

instructions); *Lafler,* 132 S. Ct. at 1386; *Ross,* 672 F.3d at 211; *Thomas,* 570 F.3d at 121 n.7.

In sum, the Court finds that Attorney Ayala did not render constitutionally ineffective

assistance to Simon.

### 2.  Harold Willocks, Esq.

Simon argues that Attorney Harold Willocks' representation on direct appeal from the

Superior Court was ineffective because Willocks moved to withdraw pursuant to *Anders*

"notwithstanding that at the time of his representation of Simon the subject matter jurisdiction

was still, and is, in question." Appellant's Brief at 50. Simon also faults Willocks for failing to

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 68

raise the late amendment to the Information as well as the constructive amendment of the

Information. He posits that, if Willocks had attacked the jurisdiction of the Court or the

additional counts in the Information, his conviction would have been vacated (at least as to

felony murder and robbery) and he would have been convicted, at most, of burglary. *Id.* at 50-51.

As indicated above, in August 1995, Willocks—the then Territorial Chief Public

Defender—filed a motion with this Court asking to be relieved as Simon's counsel. JA 758-59.

In February 1996, he filed an Affirmation and Memorandum of Points and Authorities asking to

be relieved as counsel stating, *inter alia*, that his office could find no basis for the appeal of

Simon's conviction and an appeal would be frivolous; that he could find no indication of

ineffective assistance of counsel by Ayala; and that he wrote to Simon regarding those

determinations but received no response. JA 762-66. On August 8, 1996, Joseph was substituted

as counsel on Simon's direct appeal. JA 813-14.

The issues upon which Simon bases his ineffective assistance claim against Willocks—

the amended Information, constructive amendment, and subject matter jurisdiction—have

already been discussed and found to be without merit. These same issues, therefore, cannot form

the basis for a successful ineffective assistance of counsel claim. *See Lafler,* 132 S. Ct. at 1386;

*Ross,* 672 F.3d at 211; *Thomas,* 570 F.3d at 121 n.7; *see also United States v. Domian*, 92 F.

App'x 913, 920 (3d Cir. 2004) (holding that defendant was not prejudiced by any deficient

performance by counsel, for purposes of ineffective assistance claim, in filing inadequate *Anders*

brief, where omitted issue, though not frivolous, was meritless, such that result of appeal would

not have been different). Accordingly, the Court finds that Simon's claim of ineffective

assistance of counsel directed at Attorney Willocks must fail.

###            3.   **Michael Joseph, Esq.**

Simon asserts that Attorney Michael Joseph's representation of him was ineffective on

two grounds. First, Simon complains that Joseph did not raise the *Brady* and subject matter

jurisdiction issues in the November 1996 Supplemental Brief that Joseph filed on direct appeal to

this Court. Appellant's Brief at 51. Second, Simon claims that Joseph was ineffective because he

failed to appeal this Court's Opinion affirming Simon's conviction to the Third Circuit. *Id.* at 52.

Simon filed his own appeal, but it was dismissed as untimely. *Id.*

In August 1996, Joseph was substituted for Willocks to represent Simon in the direct

appeal of his Superior Court conviction. JA 813-14. Joseph filed a brief in November 1996, in

which he raised only the issue of the late amendment of the Information. JA 815-18. This Court

affirmed Simon's conviction on August 20, 1997. JA 820-27.

On September 10, 1997,  Joseph wrote to Simon informing him that he had received

Simon's September 9, 1997 telephone message "in which you demanded that I file a notice of

appeal to the 3d Circuit from your direct appeal to the Appellate Division[.]" JA 828. Joseph

went on to say that "an appeal would be frivolous and without merit"; that he had found a

meritorious argument concerning amendment of the Information which the Appellate Division

"thoroughly reviewed and wrote an opinion" which he found to be "sound"; that he was "exempt

from appointment to cases by the rules of the Territorial Court"; and that he was "therefore

advising you that [you] should seek other counsel if you insist on an appeal to the Third Circuit

Court of Appeals. Note that you must file such notice immediately." *Id.*

 Simon drafted a Notice of Appeal dated September 11, 1997. JA 829. The date stamp

shows it was received by the District Court on September 22, 1997 and certified on September

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 70

23, 1997. *Id.* The Third Circuit docketed Simon's appeal on September 30, JA 830, and

dismissed it as untimely on December 12, 1997. JA 831.

With regard to Simon's first argument—that Joseph was ineffective for failing to raise

the *Brady* and jurisdictional issues, this Court has already found that these claims have no merit.

Appellate counsel cannot be faulted for not raising meritless claims. *See Williams v. Beard*, 637

F.3d 195, 207 (3d Cir. 2011) ("Because the . . . claim was meritless, [defendant's] trial and

appellate counsel could not have been ineffective for failing to raise it."); *United States v. Bell*,

2010 WL 1854113, at *14 (W.D. Pa. May 3, 2010) ("To show that appellate counsel was

deficient under *Strickland*, a defendant must do more than allege that counsel failed to raise

every non-frivolous issue, insofar as appellate counsel is under no obligation to raise all issues,

but may pick and choose so as to maximize the chances of a successful appeal.") (citing *Smith v.

Robbins*, 528 U.S. 259, 288 (2000)); *Sewell v. Dickson*, 2009 WL 112839, at *3 (W.D. Pa. Jan.

14, 2009) ("Appellate counsel cannot be found ineffective for failing to raise meritless claims on

appeal.") (citing *Diggs v. Owens*, 833 F.2d 439, 446 (3d Cir. 1987)). This argument therefore

fails.

The argument concerning Joseph's failure to file a notice of appeal to the Third Circuit,

however, is more troubling. Preliminarily, the Court notes that Joseph appealed Simon's

Superior Court conviction to this Court, and filed a merits brief. This Court considered the

argument contained in that brief, and rejected it. As a result, Simon's conviction received a

merits review on direct appeal as of right. However, a distinguishing characteristic of Superior

Court cases that were appealed through the Appellate Division before 2007 is that such cases

also benefitted from another appeal as of right: from the Appellate Division to the Third Circuit

Court of Appeals. *See Gov't of the V.I. v. Hodge*, 359 F.3d 312, 323 (3d Cir. 2004) (discussing the "two-tier appellate review as of right" from the Appellate Division, and stating that "Congress . . . has granted litigants an appeal as of right [to the Third Circuit] from the Appellate Division."). It is the failure to file a notice of appeal for this second appeal as of right to which Simon's ineffective assistance of counsel claim against Joseph is directed.

Generally, ineffective assistance of counsel claims are raised in the first instance in habeas petitions before the trial court. The court decides whether to hold an evidentiary hearing on the issue and makes factual findings that form the basis of the court's resolution of the issue. If appealed, the appellate court has a factual record to review. *See, e.g., Hughley,* 2011 WL 4463309, at *3; *Delsol v. Gov't of the V.I.*, 2007 WL 4698610, at *7 (V.I. Super. Nov. 8, 2007).

As indicated *supra*, Simon's ineffective assistance of counsel claims were never raised in his instant habeas petition, and the Superior Court's Certificate of Probable Cause did not address those claims. (Dkt. No. 34). Thus, this Court is addressing those claims in the first instance on this appeal. While the Court has found the existing record sufficient to render a ruling on most of the ineffective assistance claims raised by Simon, the Court finds the record insufficient to do so with regard to the failure to appeal claim against Joseph.

The only evidence in the record that bears upon this issue is Joseph's September 10, 1997 letter which indicates that it was written in response to Simon's September 9, 1997 telephone call. JA 828. The record does not contain any factual context or other surrounding circumstances within which to consider the letter, and we are unaware whether any such relevant facts exist. The development of any such facts is the province of the Superior Court.

Therefore, we find that remand to the Superior Court is appropriate to develop the factual record underlying Simon's claim that Attorney Michael Joseph rendered ineffective assistance of counsel in failing to file a notice of appeal of this Court's August 20, 1997 Opinion affirming Simon's conviction to the United States Court of Appeals for the Third Circuit. *See United States v. Headley*, 923 F.2d 1079, 1083 (3d Cir. 1991) (citing Third Circuit repeated holdings that '"the proper avenue for pursuing [ineffective assistance of counsel] claims is through a collateral proceeding in which the factual basis for the claim may be developed."') (quoting *United States v. Theodoropoulos*, 866 F.2d 587, 598 (3d Cir. 1989)). The remand in this instance will be a record remand, which the Third Circuit—in an earlier opinion in this case—described as "the record [being] returned to the Superior Court for a specific purpose," as opposed to a "case remand, meaning the case was returned to the Superior Court for all purposes." *Simon*, 679 F.3d at 113-14 (citing cases). In a record remand, the appellate court

> 'retains jurisdiction over the case, *i.e.*, jurisdiction over the case remains with [the appellate] court, but the record is returned to the trial court. In those circumstances, the trial court may be directed to clarify or amplify some portion of the record, to make additional findings, to hear further testimony, or to explain a ruling. The point of such a remand is to give the trial judge the opportunity to complete or clarify the record so that this court [the Appellate Division] will have an adequate basis for review of the trial court's rulings. The trial court does not, however, have the authority to amend the ruling that is on appeal. . .'

*Hypolite v. People of the V.I.*, 2009 WL 152319, at *3 (V.I. Jan. 21, 2009) (quoting *Hodge v. McGowan,* Civ. No. 2007-057, slip op. at 8 n.4 (V.I. Nov. 10, 2008)); *see also Martinez v. Stridiron*, 2011 WL 1483260, at *3 (V.I. Mar. 22, 2011) (quoting *Martinez*, D.C. Civ. App. No. 2005/052, slip op. at 4-6, D.V.I. App. Div. Nov. 3, 2010)).

This Court's record remand to Superior Court is for the sole purpose of developing the factual record on the alleged ineffective assistance of Joseph as it pertains to his failure to file a

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 73

notice of appeal of this Court's August 20, 1997 Opinion to the Third Circuit. Once that record is

made, and the Superior Court has made factual findings, we will "receive[ ] the appeal back

again under the same appeal number," review the Superior Court's holding, and determine what

the proper remedy, if any, should be. *Simon*, 679 F.3d at 114.

### 4.   Arturo Watlington, Esq.

On February 2, 1995—before the Superior Court entered the judgment and commitment

following Simon's January 1995 trial—Simon filed a petition for habeas corpus in the Superior

Court. *See Carl Simon v. Gov't of the V.I., Att'y Gen., Bureau of Corrs.-Warden*, Terr. Ct. Misc.

No. 7/1995. JA 48. The petition was denied in August 1998, JA 832-37, and Simon filed a notice

of appeal with this Court. JA 838. In May 2000, Simon's appointed appellate counsel in that case

moved to withdraw, and Attorney Arturo Watlington was appointed to represent Simon. JA 866.

The February 1995 habeas petition and appeal is an entirely separate proceeding from the

instant case. These two proceedings were not joined by consolidation or in any other way. Nor is

there anything in the record before this Court that pertains to Watlington's representation of

Simon in the separate habeas action. Watlington did not represent Simon in the underlying

case—either in the trial court, on direct appeal, or in the instant habeas petition—as did the other

attorneys against whom he has brought ineffective assistance of counsel claims that this Court

has ruled upon in the instant matter. It is beyond cavil that a court may only adjudicate an

ineffective assistance of counsel claim in the habeas case before it—not in a separately docketed

habeas case where another counsel represented the same Defendant. Accordingly, the Court will

not consider Simon's claim of ineffective assistance of counsel as it pertains to Attorney

Watlington.

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 74

### 5.   Gwendolyn Wilds, Esq.

Finally, Simon asserts that Attorney Gwendolyn Wilds, Esq., who was appointed as counsel to litigate Simon's February 2000 habeas petition in Superior Court, provided ineffective assistance because she "failed to diligently investigate Simon's claims and failed to brief the [*Brady*] issue for the Territorial Court." Appellant's Brief at 55. Simon claims that although Wilds requested the June 1995 Roach resentencing transcript, "[t]here is no indication that Wilds ever received [it]"; that the transcript would have shown the quid pro quo agreement between Roach and the U.S. Attorney's Office; that she could have provided the transcript to the Territorial Court to show that Roach was offered a reduction of his sentence in exchange for his testimony and waiver of appeal; and that her performance was, therefore, objectively unreasonable and deficient. *Id.* at 55-56.

This claim fails because this Court has already found that the *Brady* claim has no merit, and that the Roach resentencing transcript does not establish that a quid pro quo agreement existed between the prosecutor and Roach. Since failure to raise a meritless claim cannot be a predicate for ineffective assistance of counsel, Simon's claim against Wilds must fail. *See Lafler,* 132 S. Ct. at 1386; *Ross,* 672 F.3d at 211; *Thomas,* 570 F.3d at 121 n.7.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Simon's appeal of his habeas petition is dismissed in part and remanded in part. It is remanded to the Superior Court for a development of the factual record underlying Simon's claim that Attorney Michael Joseph rendered ineffective assistance of counsel in failing to appeal this Court's August 20, 1997 Opinion affirming Simon's conviction to the United States Court of Appeals for the Third Circuit. In this record remand, the Superior

*Simon v. Government of the V.I.*
D.C. Civ. App. No. 2003-024
Memorandum Opinion
Page 75

Court should develop the factual record, make findings, and return the case to this Court for

appellate review and determination, if appropriate, of the proper remedy. Simon's habeas

petition is dismissed in all other respects.

  An appropriate Order follows.